IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE     §
COMMISSION,                 §
                            §
                Plaintiff,  §
                            §  Civil Action No. 3:07-CV-1188-D
VS.                         §
                            §
AMERIFIRST FUNDING, INC.,   §
et al.,                     §
                            §
                Defendants. §

MEMORANDUM OPINION
AND ORDER

The court-appointed temporary receiver ("Receiver") and plaintiff Securities and Exchange Commission ("SEC") move to hold defendant Jeffrey E. Bruteyn ("Bruteyn"), his mother Lois Whitcraft ("Lois"), his stepfather Ronald Whitcraft ("Ronald"), and his former lawyer, Phillip W. Offill, Esquire ("Offill") (collectively, "respondents"), in civil contempt for violating an order of this court freezing the assets of defendants and of relief defendants ("Freeze Order") and an order appointing temporary receiver ("Receivership Order").[1]  Following an evidentiary hearing, the court finds under a clear and convincing evidence standard that Bruteyn violated the Freeze Order and the Receivership Order, and that Lois and Offill knowingly aided and abetted Bruteyn in

_____

[1]The SEC, as a matter of policy, only seeks to hold Bruteyn in civil contempt.  For ease of reference, the court will refer throughout this memorandum opinion to the contempt motion as if filed against all respondents by the SEC and the Receiver.

violating the Freeze Order.[2]  The court therefore holds Bruteyn,
Lois, and Offill in civil contempt.  The court otherwise denies the
SEC's and Receiver's motion.

Bruteyn has separately filed a motion for release of funds.
The court denies the motion.[3]

I

On July 2, 2007 plaintiff SEC sued Bruteyn, Dennis W. Bowden,
("Bowden"), AmeriFirst Funding, Inc. ("AmeriFirst Funding"), and
AmeriFirst Acceptance Corp. ("AmeriFirst Acceptance"), alleging
that they were operating an investment fraud, in violation of
§§ 5(a), (c), and 17(a) of the Securities Act of 1933, and § 10(b)
of the Securities and Exchange Act of 1934.  The SEC joined
American Eagle Acceptance Corp. ("American Eagle") and Hess
Financial Corp. ("Hess Financial") as relief defendants.  That same
day, the court issued the Freeze Order, which provides, in
pertinent part:

> Defendant and Relief Defendants, their
> officers, agents, employees, servants,
> attorneys and all persons in active concert or
> participation with them, who receive actual
> notice of this order by personal service or
> otherwise, are restrained and enjoined from,
> directly or indirectly, making any payment or

---

[2]As permitted by Fed. R. Civ. P. 52(a), the court sets out its
findings of fact and conclusions of law in this memorandum opinion
and order.

[3]This motion was not the subject of the contempt hearing, but
the court is deciding it in this memorandum opinion and order
because a decision follows logically from the court's reasoning.

> expenditure of funds . . . and from assigning
> conveying, transferring, encumbering,
> disbursing, dissipating, selling,
> hypothecating, or concealing any assets,
> monies, or other property owned by or in the
> actual or constructive possession of
> defendants or Relief Defendants.

Freeze Order § IV. Also on July 2, 2007 the court filed a Receivership Order that, *inter alia*, appointed William D. Brown as a temporary receiver. The Receivership Order granted the Receiver exclusive jurisdiction over all receivership "assets, monies, securities, claims in action, and properties, real and personal, tangible and intangible, of whatever kind and description, wherever situated" of the defendants and relief defendants. Receivership Order § I(1). The Receivership Order directs

> [a]ll persons, including defendants and Relief
> Defendants, and their officers, agents,
> servants, employees, brokers, facilitators,
> attorneys, and all persons in active concert
> or participation with them who receive actual
> notice of [the] order by personal service or
> otherwise [to] . . . promptly deliver to the
> Receiver all Receivership Assets in the
> possession or under the control of any one or
> more of them[.] No separate subpoena shall be
> required.

*Id.* at § I(3).

On July 25, 2007 the SEC amended its complaint to include five additional relief defendants: InterFinancial Holding Corp. ("InterFinancial"), Hess International Properties, LLC ("Hess Properties"), Hess International Investments, S.A. ("Hess Investments"), United Financial Markets, Inc. ("United Financial"),

- 3 -

and Gerald Kingston ("Kingston") (collectively, "Additional Relief Defendants").  On July 31, 2007 the court extended the Freeze Order by granting the SEC's motion for a preliminary injunction.  The court then supplemented the preliminary injunction on August 2, 2007 by subjecting the Additional Relief Defendants to the asset freeze.  Likewise, on August 2, 2007 the court amended the Receivership Order ("Amended Receivership Order") to place the assets of the Additional Relief Defendants within the receivership estate.

On September 24, 2007 the Receiver and the SEC (sometimes referred to collectively as "the Receiver") filed the instant motion to show cause, seeking to establish that Bruteyn, Lois, Ronald, and Offill should be held in civil contempt for violating the court's Receivership Order and Freeze Order.  They allege that respondents engineered a scheme to divert $431,161.00 from United Financial to pay for Bruteyn's attorney's fees and living expense through the sale of a Picasso painting ("the Picasso") that Lois owned.[4]  The Receiver asserts that this transaction violates the Freeze Order because the money in United Financial's account was owed to Hess Financial, a relief defendant subject to the Freeze

---

[4]Respondents adduced evidence that Lois believed the Picasso was authentic and had significant value.  As the court explains below, however, the credible evidence developed at the hearing establishes that the Picasso is a reproduction print of relatively modest value, certainly far less in value than the price for which Lois sold it to United Financial.  For ease of reference, the court will refer to the reproduction print as "the Picasso."

Order.

The Receiver also alleges that Ronald has violated the Receivership Order by failing to transfer to the Receiver title and possession of a house located at 6717 Lakewood Boulevard, Dallas, Texas ("Lakewood House"). The Receiver contends that the Lakewood House, which now serves as Bruteyn's residence, was purchased and improved solely with Hess Financial's money and thus is a receivership asset over which the Receiver has exclusive control.

Finally, the Receiver seeks to hold Bruteyn in civil contempt for failing to deliver to the Receiver a 2002 BMW 745Li ("BMW") that Hess Financial also purchased and that was under the Receiver's control pursuant to the Receivership Order.

After the court set the motion for a hearing, the Receiver filed on November 7, 2007 a supplemental brief seeking to hold Bruteyn in civil contempt.[5] The SEC filed a supplemental brief on December 12, 2007, attempting to address Bruteyn and Ronald's anticipated arguments that Hess Financial's payments into the Lakewood House were a return on the Whitcrafts' previous investments in Hess Financial and a related entity. On December 31, 2007 the Receiver filed a second supplemental brief in support

_____

[5]The supplemental brief includes allegations that Bruteyn has continued to violate the Freeze Order in ways different from those alleged in the original contempt brief. But the Receiver failed to establish these violations by clear and convincing evidence, because he did not introduce evidence at the hearing concerning these more recent alleged violations. Therefore, the court need not address them.

of the original contempt motion. In this brief, the Receiver advances theories of fraudulent transfer under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Com. Code Ann. § 24.001 *et seq.* (Vernon 2002), for the sale of the Picasso from Lois to United Financial for $431,161.00, and for the purchase and improvement of the Lakewood House for the benefit of Ronald. The Receiver maintains that United Financial was insolvent when it purchased the Picasso and that it did not receive reasonably equivalent value in exchange for the transfer of $431,161.00. Similarly, the Receiver contends that Hess Financial was insolvent when it financed and improved the Lakewood House and that it did not receive reasonably equivalent value for these transfers of money. According to the Receiver, because the $431,161.00 is actually an asset of United Financial after application of TUFTA, respondents' failure to deliver this money to the Receiver violated the Amended Receivership Order, which makes all assets of United Financial receivership assets. Similarly, the Receiver contends that Ronald's refusal to deed the Lakewood House to the Receiver violates the Receivership Order, because when TUFTA is applied to the purchase and improvement of the Lakewood House, it is an asset of Hess Financial and therefore a receivership asset.

The court conducted a hearing on January 8 and 9, 2008, and it now enters its decision.

To prove that respondents should be held in civil contempt, the Receiver "must establish by clear and convincing evidence that (1) a court order was in effect, (2) the order required specified conduct by the respondent, and (3) the respondent failed to comply with the court's order." *United States v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir. 2004). "The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (citing *NLRB v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984)). "'[I]n civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's order.'" *Jim Walter Res., Inc. v. Int'l Union, United Mine Workers of Am.*, 609 F.2d 165, 168 (5th Cir. 1980) (quoting *United States v. Ross*, 243 F. Supp. 496, 499 (S.D.N.Y. 1965)). "Good faith is not a defense to a civil contempt; the question is whether the alleged contemnor complied with the court's order." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002). These principles of intent and good faith apply to Bruteyn, as a defendant in this action, but not to Lois, Ronald, and Offill, who are non-parties. Non-parties with actual notice of the court's order who knowingly aid and abet another in violating the court's order may also be held in contempt. *See NLRB v. Laborers' Int'l Union of N. Am.,*

*AFL-CIO*, 882 F.2d 949, 954 (5th Cir. 1989); *Waffenschmidt v.*
*Mackay*, 763 F.2d 711, 714 (5th Cir. 1985). "Although good faith is
irrelevant as a defense to a civil contempt order, good faith is
relevant to whether [a non-party] aided or abetted [a party] in
dissipating the funds with knowledge that [the non-party] was
violating the court's orders." *Waffenschmidt*, 763 F.2d at 726.

In the contempt context, "clear and convincing evidence" is
"that weight of proof which produces in the mind of the trier of
fact a firm belief or conviction as to truth of the allegations
sought to be established, evidence so clear, direct, weighty and
convincing as to enable the fact finder to come to a clear
conviction, without hesitancy, of the truth of the precise facts of
the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th
Cir. 1995) (internal quotation marks omitted) (adopting in contempt
context definition of clear and convincing evidence used in
attorney disbarment proceeding) (quoting *In re Medrano*, 956 F.2d
101, 102 (5th Cir. 1992)).

Respondents concede that the Receiver and SEC have met the
first element of the contempt test as to all of their allegations,
i.e., that a court order was in effect. As to the Receiver's
fraudulent transfer claims, respondents deny that the court's
orders specifically cover such transfers, and they maintain that
contempt proceedings do not provide the proper procedural mechanism
to set aside transfers under TUFTA. Respondents also contend that,

even if the court's orders do enjoin holding the fruit of fraudulent transfers, the transactions in question are not fraudulent under TUFTA. Aside from the Receiver's fraudulent transfer claims that relate to the sale of the Picasso, respondents concede that the Freeze Order specifically prohibited the sale or disbursement of various assets and moneys. They argue, however, that because Lois owned the Picasso, and it was not the property of any defendant or relief defendant, the Freeze Order did not encompass the Picasso. Likewise, regarding the other side of the sale of the Picasso, they maintain that the funds transferred from United Financial's account to Lois were not covered by the Freeze Order because, at the time of the sale, United Financial was not a relief defendant, and its funds were therefore not subject to the Freeze Order.

Regarding the Lakewood House, respondents concede the second element of the contempt test: that the Receivership Order specifically required respondents to deliver to the Receiver all receivership assets, including real property owned by Hess Financial. They oppose the Receiver and SEC's contention, however, that the Lakewood House is owned by Hess Financial and thus is a receivership asset.

Bruteyn argues that the BMW is not a receivership asset because when Hess Financial purchased it, Bruteyn traded in his previous car, a Porsche, which was worth about the same as the BMW.

To determine whether respondents should be held in civil contempt, the court will analyze separately the Receiver's claims concerning (1) the Picasso sale with United Financial, (2) the Lakewood House transaction, and (3) the BMW.

A

The Receiver presents two grounds for holding respondents in contempt for the sale of the Picasso to United Financial for $431,161.00. First, he maintains that, under the March 1, 2007 Stock Finance Agreement between United Financial and Hess Financial, and the December 1, 2006 Stock Purchase Agreement between United Financial and American Eagle ("Stock Purchase Agreement"), United Financial owed Hess Financial and American Eagle a combined total of $430,608.00 on July 5, 2007. On July 5, 2007 United Financial wired almost all the money in its bank account—the sum of $431,161.00—to Lois in exchange for the Picasso. At the time of the sale, both Hess Financial and American Eagle were relief defendants and were covered by the Freeze Order. The Receiver maintains that Bruteyn and the other respondents who acted in concert with him violated the Freeze Order by diverting to Lois the sum of $431,161.00 from United Financial's account that should have gone to the relief defendants—Hess Financial and American Eagle—in payment for a worthless reproduction print of a Picasso.

Second, the Receiver asserts a fraudulent transfer claim.  He maintains that at the time of the Picasso sale on July 5, 2007, United Financial was insolvent, and it did not receive reasonably equivalent value from Lois in exchange for the $431,161.00 that it paid her for the Picasso, because the Picasso was worth no more than $125.00.

B

The court rejects the Receiver's first basis for holding respondents in contempt.  Although the evidence supports the Receiver's position that, at the time of the $431,161.00 wire transfer from United Financial to Lois, United Financial owed a combined total of $430,608.00 to relief defendants Hess Financial and American Eagle, it does not follow that the funds in United Financial's account that were used to purchase the Picasso were "monies . . . owned by or in the actual or constructive possession of defendants or Relief Defendants."  Freeze Order § IV.  At the time the Picasso was sold, United Financial was not named as a defendant or relief defendant in the Freeze Order.  The Receiver has not provided any authority, and the court is aware of none, that supports the premise that, because Hess Financial and American Eagle had a legal claim against United Financial for $430,608.00, the sum of $431,161.00 in United Financial's account was "monies . . . owned by or in actual or constructive possession of defendants or Relief Defendants."  *Id.*

Despite this conclusion, the court finds by clear and convincing evidence that both the Picasso and the $431,161.00 in United Financial's account were covered by the Freeze Order. Because the court reaches this finding without resorting to TUFTA, it need not address in this context the parties' TUFTA arguments or whether it can rely on TUFTA in a contempt proceeding to set aside a fraudulent transfer.[6]

The court first asks whether the Picasso was an asset covered by the Freeze Order. The Freeze Order covered "assets . . . [and] other property owned by or in the actual or constructive possession of defendants or Relief Defendants." Freeze Order § IV. Although Lois owned the Picasso, it was in the actual possession of Bruteyn at the time of the July 5, 2007 sale, and was therefore subject to the Freeze Order. The evidence establishes, and respondents do not deny, that, at the time of the July 5, 2007 sale and in the months before this sale, the Lakewood House was Bruteyn's personal residence, even though title was in the name of his stepfather Ronald. Ronald and Lois (Bruteyn's mother) lived in Pennsylvania and visited the Lakewood House occasionally. Amy Miglini ("Miglini"), who was Bruteyn's girlfriend at the time of the Picasso sale, testified that the Picasso hung on Bruteyn's bedroom

---

[6]The court later addresses the question whether the Receiver can assert a TUFTA claim in a contempt proceeding. *See infra* at § IV(B).

wall inside the Lakewood House. Kingston likewise testified that, before the July 5, 2007 sale, he had seen the Picasso in Bruteyn's home, i.e., the Lakewood House. Kingston also testified that, on the day of the sale, the Picasso was still hanging on the wall of Bruteyn's bedroom at the Lakewood House, and that to consummate the transaction, Kingston went to Bruteyn's home that day to pick it up and bring it to Offill's office. The court finds by clear and convincing evidence that, on July 5, 2007, Bruteyn was in actual possession of the Picasso, notwithstanding the fact that Lois may have owned it. The Freeze Order clearly covered "assets . . . in the actual possession . . . of defendants." Freeze Order § IV. At the time of the sale, Bruteyn was a named defendant in this suit. The Freeze Order prohibited "Defendant and Relief Defendants, their officers, agents, employees, servants, attorneys and all persons in active concert or participation with them, who receive actual notice of this order by personal service or otherwise . . . from . . . conveying [or] transferring" such assets. *Id.* Therefore, the July 5, 2007 sale of the Picasso clearly violated the Freeze Order.

D

The court next examines the other side of the transaction: whether the $431,161.00 in United Financial's account on July 5, 2007 was covered by the Freeze Order. In 2005 Bruteyn approached Kingston about his interest in selling secured debt obligations

("SDOs") in connection with the underlying investment scheme that the SEC seeks to shut down by this lawsuit. Kingston began selling SDOs for Bruteyn in 2006. Sometime thereafter, Bruteyn and Kingston formed United Financial, which was a company primarily involved in stock trading. Bruteyn and Kingston both owned 50% of United Financial. Kingston was the administrator of United Financial and was the sole signatory on United Financial's account. United Financial earned commissions on the sale of stock, and it periodically distributed profits to Kingston and Bruteyn.

Until July 2007 all of United Financial's income was associated with the sale of unregistered securities of InterFinancial. In the Fall of 2006, Bruteyn suggested to Kingston that United Financial start acquiring shares of InterFinancial. Bruteyn presented the plan to buy a number of shares low and sell high. United Financial then entered into the Stock Purchase Agreement with American Eagle in December 2006, under which United Financial purchased 3.2 million shares of InterFinancial for $415,000 ($0.13 a share). United Financial would in turn sell the shares for about $1.00 per share. Kingston testified that he believed Bruteyn drafted the Stock Purchase Agreement. Under the Stock Purchase Agreement, United Financial was to pay American Eagle the sum of $415,000 by May 15, 2007. United Financial did pay American Eagle $150,000, but as of July 2007, $265,000 remained unpaid. Kingston wanted to pay off the $265,000 indebtedness when

United Financial had the money, but Bruteyn said that they did not need to. Kingston acquiesced, and the non-payment of the $265,000 debt to American Eagle became a source of friction between Kingston and Bruteyn.

United Financial later financed the purchase of InterFinancial stock through the March 1, 2007 Stock Finance Agreement. The Stock Finance Agreement provided for a tiered payment plan under which United Financial was to pay Hess Financial up to 95% of the proceeds on United Financial's sales of InterFinancial stock.

Kingston never discussed with Bruteyn the activities of InterFinancial, and Kingston did not know whether InterFinancial owned any assets. Alan Nelson ("Nelson"), an accountant for the Receiver, testified that, after reviewing the available financial records, he was not aware that InterFinancial owned any assets. Ronald (Bruteyn's stepfather) was the President of InterFinancial. But Ronald's testimony revealed that, although he was compensated for his position as President, he was not at all familiar with InterFinancial's financial situation, and he never attended an InterFinancial board meeting. Ronald did not even know that United Financial was selling InterFinancial stock. Ronald simply stated that he let his stepson, Bruteyn, handle everything with InterFinancial.

Although Kingston managed United Financial's account, Bruteyn directed Kingston concerning the selling price and quantity of

InterFinancial stock.  When Kingston asked Bruteyn who was on the buy side of these sales, Bruteyn told him that he did not need to know.  On June 29, 2007 Bruteyn instructed Kingston to sell 371,000 shares of InterFinancial for $495,000 ($1.35 a share).  The money from the sale was deposited to United Financial's account on July 3, 2007.

Within the first few days after the court entered the July 2, 2007 Freeze Order, Bruteyn, Offill, Bowden, and Kingston met at Offill's office[7] to discuss how Bruteyn could obtain funds for living expenses and to pay his lawyer.  They eventually focused on a plan under which United Financial——who was neither a defendant nor a relief defendant——could use funds from the $495,000 balance in its account from the sale of the InterFinancial shares, without violating the Freeze Order.  Bruteyn stated numerous times that the $495,000 in United Financial's account was *his* money and that he wanted to find a way to get it back.  Bruteyn demanded that this money go to him.  Under the Stock Finance Agreement, the sale proceeds were supposed to go to Hess Financial, a company that Bruteyn controlled.  Bruteyn was managing director of Hess Financial.  Kingston told Bruteyn that the money was supposed to go

_____

[7]The date and time of this meeting were hotly contested during the hearing, but the court need not resolve this specific dispute for purposes of this decision.  Even assuming that Kingston's testimony reflects an imperfect recollection of some pertinent details, the court finds credible and reliable the components of his testimony that are material to the reasoning followed in this contempt ruling.

to Hess Financial, but Bruteyn reiterated his position that it was *his* money. Offill stated that transferring the money to Hess Financial would not work, because, as a relief defendant, Hess Financial was subject to the Freeze Order. Bruteyn then suggested selling the Picasso to United Financial. Offill expressed concern that the Picasso might be an asset subject to the Freeze Order, but when Bruteyn affirmed that he did not own the Picasso, and Lois (his mother) owned it, Offill opined that the transaction would work, i.e., it would not violate the Freeze Order.

Kingston had seen the Picasso before and, based on conversations with Bruteyn, he believed it was an original. Bruteyn asserted that the Picasso was worth more than $600,000. He told Kingston that Lois would sell it to United Financial for $500,000, with an option for her to buy it back for $550,000. Bruteyn assured Kingston that Lois would buy the Picasso back, so United Financial would make a profit of $50,000. Kingston saw this as an opportunity to make $50,000, and he agreed to the sale. Kingston testified that the plan for Lois buy the Picasso back was an important part of the proposed transaction, and that he would not have concurred in the sale without the repurchase agreement.

Although the sale of the Picasso was between Lois and United Financial, Lois and Kingston never had any personal dealings, and they communicated solely through Bruteyn. Bruteyn telephoned Lois to propose the sale of the Picasso. Although the sale price was

supposed to be $500,000, after deducting some expenses from the $495,000 balance in United Financial's account, all that remained was $431,161.00, so this became the new sale price. On July 5, 2007 United Financial wired $431,161.00 to Lois's bank account in payment for the Picasso.

When cross-examined about his willingness to go along with the sale, Kingston acknowledged that he was the only one who had signature authority on United Financial's account, but he felt pressured to go through with the transaction when Bruteyn declared that it was his money and that he wanted to get his money back. Kingston felt indebted to Bruteyn because Bruteyn had placed him in a position where he made much more money than he had earlier in his career. Kingston acknowledged that owing a good part of his financial success to Bruteyn was one of the reasons why Bruteyn did not need signature authority for United Financial's account to be able to direct its affairs.

Bruteyn neither owned the funds in United Financial's account, nor did he have actual possession of them, because he did not have signature authority on United Financial's bank account. But the Freeze Order was not limited in scope to property within the *actual* possession of those who were subject to the order: it covered "monies . . . in the actual or *constructive possession* of the defendants." Freeze Order § IV (emphasis added). The court must therefore decide whether, under the facts found above, Bruteyn had

- 18 -

*constructive* possession of the $431,161.00 in United Financial's bank account.  If he did, then the sum of $431,161.00 constitutes monies covered by the Freeze Order, and the transfer of these funds to Lois clearly violated the commands of the Freeze Order.

E

Under Texas law, "'[c]onstructive possession is that which exists without actual personal occupation of land or without actual personal present dominion over a chattel, but with an intent and capability to maintain control and dominion.'"  *Mehan v. Wamco XXVIII, Ltd.*, 138 S.W.3d 415, 418 (Tex. App. 2004, pet. ref'd) (quoting *Blankenship v. Citizens Nat'l Bank of Lubbock*, 449 S.W.2d 77, 79 (Tex. Civ. App. 1970, writ ref'd n.r.e)).  The court is not aware of any other definition of constructive possession followed by Texas courts.  Nor is the court aware of a relevant Texas case dealing with constructive possession of an intangible asset, such as a bank account.  Because federal common law on the concept of constructive possession is more developed and is consistent with the Texas general definition of constructive possession, the court will look to federal common law for guidance in determining whether Bruteyn had constructive possession of the $431,161.00 in United Financial's bank account.

In federal criminal cases, this court routinely instructs juries that "[a] person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to

exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it."  In federal drug cases, the Fifth Circuit has defined constructive possession as "the 'knowing exercise of, or the knowing power or right to exercise dominion and control over the proscribed substance.'"  *United States v. Mata*, 491 F.3d 237, 242 (5th Cir. 2007) (quoting *United States v. Cisneros*, 112 F.3d 1272, 1282 (5th Cir. 1997)).  "Constructive possession need not be exclusive; it may be shared with others."  *United States v. DeLeon*, 641 F.2d 330, 335 (5th Cir. Unit A Apr. 1981).  "Constructive possession can be established by showing (1) ownership, dominion, or control over an item; or (2) dominion or control over the place where the item is found."  *United States v. Salinas*, 480 F.3d 750, 759 (5th Cir. 2007).  "Constructive possession may also be proven by showing that contraband was in the direct physical possession of a person over whom a defendant exercised control."  *United States v. Jones*, 484 F.3d 783, 788 n.11 (5th Cir. 2007).  In *United States v. Kelly*, 683 F.2d 871 (5th Cir. 1982), the defendant challenged his conviction on the basis that there was insufficient evidence that he possessed marihuana.  *Id.* at 877.  The court pointed to evidence that the buyer of the marihuana did not obtain any marihuana until after he met with the defendant and made arrangements to acquire it at another place known by the defendant.  *Id.*  The court concluded, "the defendant was at least in

constructive possession of the contraband and was a vital cog in its distribution.  The proof was not insufficient." *Id.*

Federal cases interpreting the money laundering statute, 18 U.S.C. § 1957, are even more instructive, because they deal specifically with constructive possession of money in bank accounts.  Section 1957 provides: "Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)."  18 U.S.C. § 1957(a).  "'Criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense." *Id.* at § 1957(f)(2).  Thus to be convicted for money laundering under § 1957, "the funds in question must already be proceeds obtained from a criminal offense when the defendant transfers them." *United States v. Nguyen*, 504 F.3d 561, 570 (5th Cir. 2007) (quoting *United States v. Leahy*, 82 F.3d 624, 635 (5th Cir. 1996)).  "In the case of 'fraudulent schemes,' the funds become proceeds of a criminal offense 'at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the *control* of the perpetrators." *Id.* (quoting *Leahy*, 82 F.3d at 635).

In *Nguyen* the defendant, a mortgage broker, orchestrated a fraudulent mortgage scheme whereby he and his accomplices inflated

home appraisals, found straw buyers who would acquire higher loans for the home purchases, and then, after the sales were closed, shared among themselves the excess loan proceeds. *Nguyen*, 504 F.3d at 565-66. The defendant was convicted under § 1957 for the transfer of money from the home seller to the defendant. *Id.* at 570. The defendant challenged her conviction, contending that, immediately prior to the transfer, the funds were in the seller's bank account, and the seller was not a perpetrator of the offense; thus the money in the seller's account was not "criminally derived" until the defendant received the money. *Id.* The Fifth Circuit held that the defendant had constructive possession of the funds even while the money was in the seller's bank account, because (1) the defendant explained to the seller that she would not be able to keep the entire sale proceeds, (2) the seller agreed that the surplus money would be transferred to others, (3) the defendant reassured others in the scheme that the seller would not keep the surplus money, and (4) the seller transferred the money at the defendant's request. *Id.* at 571.

The defendant in *Leahy* was convicted for money laundering under § 1957 for a transaction from an escrow account to his business's account. *Leahy*, 82 F.3d at 628-29. The money in the escrow account was obtained by fraud, but the defendant argued that he did not have control over the funds until they reached his business's account, and thus the funds in the escrow account were

not "criminally derived." *Id.* at 635. The Fifth Circuit held that the defendant's business had sufficient control over the money in the escrow account, because the defendant's business had directed the escrow agent to distribute the funds to his business through an escrow agreement. *Id.* at 635-36.

*Leahy* relied on two other circuit decisions, *United States v. Savage*, 67 F.3d 1435 (9th Cir. 1995), and *United States v. Smith*, 44 F.3d 1259 (4th Cir. 1995), that provide particular guidance. *See Leahy*, 82 F.3d at 636.

In *Savage* the defendant directed an investment fraud under which investors would first send their money to the defendant's business associates, who would then wire the money to an account in Austria, and then from Austria to the defendant's personal bank accounts in the United States. *Savage*, 67 F.3d at 1438. The defendant challenged his § 1957 conviction for the transfers from his business associates' accounts to his personal accounts on the basis that he did not have possession of the funds until they reached his personal accounts. *Id.* at 1442. The court concluded that the defendant had control of the investors' money at the time it was deposited in his business associates' accounts: "The funds were clearly at [the defendant's] disposal at the time of deposit [into his associates' accounts]——the record indicates that the parties named on the accounts transferred the money at his request. It is irrelevant that the accounts were not in [the defendant's]

name." *Id.* at 1443.

In *Smith* the defendant carried out a scheme under which he fraudulently induced lenders to advance money to Lagusa, Inc. ("Lagusa"), who would then finance projects with the defendant's business on account of kickbacks the defendant paid to Lagusa's president. *Smith*, 44 F.3d at 1262-63. The defendant challenged his money laundering conviction on the grounds that he neither possessed nor controlled the funds in Lagusa's account before they were transferred to his business. *Id.* at 1265. The court rejected the defendant's contention. "[The defendant] was in constructive control of the entire scheme to defraud, directing both [Lagusa's president] and [an accomplice] in carrying it out, and he was therefore in constructive possession and control of the fraudulently procured funds[.]" *Id.* at 1266.

F

Guided by Texas-law principles and by the relevant reasoning of these federal cases, the court finds by clear and convincing evidence that, at the time of the $431,161.00 transfer, Bruteyn had constructive possession of the money in United Financial's account. The fact that Bruteyn did not have signature authority on this account does not preclude a finding of constructive possession. Bruteyn was a 50% owner of United Financial, and he exercised significant control over Kingston, the sole administrator of United Financial's account. Bruteyn originated the idea of United

Financial's selling InterFinancial stock. And when United Financial began to make these sales, Bruteyn directed Kingston concerning the price and quantity. Bruteyn would not disclose to Kingston who was on the buy side of these transactions, and Bruteyn never discussed with Kingston what InterFinancial did as a business. When Kingston wanted to make the final payments to American Eagle under the Stock Purchase Agreement, Bruteyn told him not to, and Kingston acceded. Bruteyn specifically directed the sale of the 371,000 shares of InterFinancial on June 28, 2007 that generated the $495,000 used to buy the Picasso. In the discussions leading up to the Picasso sale, Bruteyn repeatedly stated in Kingston's presence that the money in United Financial's account was *Bruteyn's* money. When Kingston suggested the money should go to Hess Financial under the Stock Finance Agreement, Bruteyn reasserted his position that the money should go to himself. Although Kingston was uneasy about the Picasso sale, he acceded to it, largely because Bruteyn was insisting that it be done, but also because Kingston felt indebted to Bruteyn for his financial success and to generate a $50,000 profit. Bruteyn was undoubtedly the architect and moving force behind the Picasso sale. He wanted money for living expenses and anticipated legal fees, and the court's orders comprehensively restricted his options. The buyer and seller of the Picasso communicated only through Bruteyn, and Bruteyn pushed the sale on both sides of the transaction. There is

clear and convincing evidence that Bruteyn exercised dominion and control over the funds in United Financial's account. Because Bruteyn was in constructive possession of the account funds, including the sum of $431,161.00 at issue, the transfer of these funds clearly violated the terms of the court's Freeze Order. The Picasso sale contravened the Freeze Order on both sides of the sale because both the Picasso and the $431,161.00 were assets or monies subject to the Freeze Order.

G

Having concluded the transfer of $431,161.00 from United Financial's account in payment for the Picasso violated the Freeze Order, the court must determine which, if any, of the respondents should be held in contempt.

> Defendant and Relief Defendants, their officers, agents, employees, servants, attorneys and all persons in active concert or participation with them, who receive actual notice of this order by personal service or otherwise, are restrained and enjoined from, directly or indirectly, making any payment or expenditure of funds . . . and from assigning, conveying, transferring, encumbering, disbursing, dissipating, selling, hypothecating, or concealing any assets, monies, or other property owned by or in the actual or constructive possession of defendants or Relief Defendants.

Freeze Order § IV.

1

The Freeze order specifically covers defendant Bruteyn, and, as the architect and moving force behind the Picasso sale, Bruteyn

was directly involved with the prohibited transaction. Thus the court holds Bruteyn in contempt for violating the Freeze Order.

2

Although Offill is not a defendant, the Freeze Order covers those "in active concert or participation [with the defendants], who receive actual notice of this order by personal service or otherwise." *Id*. When the Picasso was sold on July 5, 2007, Offill was Bruteyn's lawyer in this lawsuit. On July 3, 2007 Offill accepted service of the SEC's complaint on behalf of Bruteyn. The Freeze Order was included in the papers served upon Bruteyn. Offill therefore had actual notice of the Freeze order, as confirmed by the fact that he was an active participant in discussions about how to get funds to Bruteyn without violating the Freeze Order.

Next, the court determines whether Offill was in active concert or participation with Brutyen in the sale of the Picasso. Offill admits that in the days following the Freeze Order, he was involved in the discussions with Bruteyn and others about how to arrange to get money for Bruteyn's living expenses and legal fees. Offill acknowledges that he was at the meeting on July 5, 2007 when the sale of the Picasso to United Financial was consummated. In the discussions leading up to the sale, Offill opined that a transfer from United Financial to Hess Financial was not a viable option, because Hess Financial was covered by the Freeze Order as

a relief defendant. After Bruteyn suggested that Lois sell the Picasso to United Financial, and after Bruteyn assured Offill that he did not own the Picasso, Offill affirmed that the transaction would work, i.e., it would not violate the Freeze Order. Offill rendered this opinion in the presence of Kingston, who, as the person with signature authority on the United Financial account, had to approve the deal on United Financial's behalf.

The court finds that Offill was in active participation with Bruteyn in the sale of the Picasso, and thus was a covered individual under the Freeze Order. For the same reason, the court finds that Offill's counsel in the discussions leading up to the sale of the Picasso print aided and abetted Bruteyn and Kingston in effecting and consummating the sale.

The only issue that remains is Offill's mental state: whether he knowingly aided and abetted Bruteyn and others in the sale of the Picasso. *See NLRB*, 882 F.2d at 954. In other words, did Offill as a nonparty have a good faith belief that the sale of the Picasso was not in violation of the Freeze order? *See Waffenscmidt*, 763 F.2d at 726. Although Offill believed that Lois owned the Picasso, he knew that Bruteyn kept the Picasso at the Lakewood House and that the Picasso was in the house on the day of the sale. The Freeze Order clearly prohibited the sale of assets that were in the actual possession of the defendants, and the Picasso was in Bruteyn's actual possession, i.e., in the house

where he lived.  Thus the court finds that Offill knowingly aided and abetted Bruteyn in the sale of the Picasso.[8]  Therefore, the court holds Offill in contempt for violating the Freeze Order.

3

Although Lois was not personally served with the Freeze Order, she admits that she was aware of the Freeze Order before the July 5, 2007 sale of the Picasso.  Lois also acknowledges that the purpose of the sale was to obtain money for Bruteyn's living expenses and attorney's fees.  Some time after the Freeze Order, but prior to the sale, Bruteyn telephoned Lois to ask her whether she would sell the Picasso, because Bruteyn's other sources of funds were subject to the Freeze Order.  Lois agreed and received a $431,161.00 wire transfer in her bank account on July 5, 2007. The court finds that Lois was in active participation with Bruteyn in the sale of the Picasso and thus was a covered individual under the Freeze Order.

The court must next decide whether Lois knowingly aided and

---

[8]Although the following is not necessary as a basis to hold Offill in civil contempt of the Freeze Order, the court notes that Offill was also aware of the influence that Bruteyn had over Kingston and thus United Financial's account.  In addition to representing Bruteyn, Offill had represented Kingston and InterFinancial.  Moreover, Offill personally witnessed Bruteyn exercise control over United Financial's account when Bruteyn asserted that the $495,000 was *his* money and pressured Kingston to go through with the sale.  Thus even from the other side of the transaction, Offill knowingly aided and abetted Bruteyn, because he must have known that United Financial's account was in the constructive possession of Bruteyn.

abetted Bruteyn in the sale of the Picasso. Even if Lois did in fact own the Picasso, she knew that, at the time of the sale, the Picasso was in the actual possession of Bruteyn. Lois admitted that she never spoke with the buyer of the Picasso but simply gave Bruteyn the authority to go through with the transaction. Although Lois testified that she consulted with an attorney about the legality of the sale, this conversation did not occur until weeks after the sale. The Freeze Order clearly prohibited the sale of assets in defendants' actual possession. Thus the court finds that Lois knowingly aided and abetted Bruteyn in the sale of the Picasso, which she knew to be in Bruteyn's actual possession. Therefore, the court holds Lois in contempt for violating the Freeze Order.

4

Ronald also received actual notice of the Freeze Order before the sale of the Picasso. But the court finds that he was not a covered individual under the Freeze Order, because he did not act in concert with Bruteyn and others in the sale of the Picasso. Although Ronald admits helping Lois distribute the $431,161.00 after she received the wire on July 5, 2007, this assistance came sufficiently after the sale, and his relevant conduct is otherwise sufficiently attenuated, that the court is unable to say by clear and convincing evidence that he thereby aided and abetted Bruteyn in the sale of the Picasso, i.e., the transaction that violated the

Freeze Order. The court declines to hold Ronald in civil contempt on this basis.

IV

The court next analyzes the Receiver's allegation that Ronald violated the Receivership Order by refusing to deed over the title to the Lakewood House.

The Receivership Order grants the Receiver exclusive jurisdiction over all "assets, monies, securities, claims in action, and properties, real and personal, tangible and intangible, of whatever kind and description, wherever situated" of the defendants and relief defendants. Receivership Order § I(1). The Receivership Order directs

> [a]ll persons, including defendants and Relief
> Defendants, and their officers, agents,
> servants, employees, brokers, facilitators,
> attorneys, and all persons in active concert
> or participation with them who receive actual
> notice of [the] order by personal service or
> otherwise [to] . . . promptly deliver to the
> Receiver all Receivership Assets in the
> possession or under the control of any one or
> more of them[.] No separate subpoena shall be
> required.

*Id.* at § I(3). The Receiver advances two grounds for holding Ronald in contempt for violating the terms of this order. First, the Receiver asserts that the Lakewood House is a receivership asset, because it was purchased and improved solely with Hess Financial money, and thus is real property owned by Hess Financial, a relief defendant whose assets, both real and personal, are to be

delivered to the Receiver. Second, the Receiver contends that Hess Financial's financing and improving the Lakewood House while Hess Financial was insolvent was fraudulent under TUFTA; therefore, the court should set aside the transfer of the Lakewood House to Ronald. If the transfers are set aside under TUFTA, the Lakewood House is owned by Hess Financial and thus is a receivership asset, which Ronald was obligated under the Receivership Order to deliver to the receiver.

A

In October 2004 Bruteyn and his former wife, Tara Bruteyn ("Tara"), purchased the Lakewood House. Title to the house was solely in Tara's name. On December 15, 2005 Tara conveyed title to Bruteyn as part of a divorce settlement. That same day, Bruteyn transferred title to Bowden, who took out a mortgage to purchase the home. The loan was secured by a deed of trust. Bowden held title to the Lakewood House until January 8, 2007, when he conveyed the title to Ronald. The deed from Bowden to Ronald was properly recorded in Dallas County. To pay the $685,000 purchase price, Ronald executed a note with Hess Financial for $600,000, which was secured by a deed of trust. The deed of trust was properly recorded in Dallas County. On the day of the sale between Bowden and Ronald, Hess Financial wired $700,000 to the title company for the closing. The sum of $600,000 represented the proceeds of a new loan, and $100,000 was applied from earnest money. The closing

statement for the sale indicates that Ronald owed the sum of $7,128.23 at closing to cover the remaining closing costs. Ronald testified that even this $7,128.23 was paid for at closing by Hess Financial. Thus the evidence establishes that all the money used to purchase the Lakewood House in 2007 came from Hess Financial.

After Ronald took title to the Lakewood House, Hess Financial paid for $265,774.84 in improvements (remodeling and renovations) to the home. The evidence suggests that even more Hess Financial money was used for improvements to the Lakewood House, because $478,000 of Hess Financial's money was unaccounted for in cash withdrawals, and Miglini, Bruteyn's former girlfriend, testified that every time she witnessed Bruteyn pay contractors working on the Lakewood House, he did so in cash. Miglini testified that the Lakewood House renovations doubled the size of an already large house. Thus Hess Financial invested at least $965,774.84 in documented expenses for the purchase and improvement of the Lakewood House, and possibly has paid much more than that in the form of undocumented cash transactions.

The first payment on Ronald's note with Hess Financial for $30,0000 was due on January 1, 2008, but Ronald has not paid it. The ad valorem taxes on the Lakewood House were due in January 2008, but Ronald has not paid them.

In the contempt hearing, Lois and Ronald contended that, based on their investment in Hess Capital LLC ("Hess Capital")——the

predecessor to Hess Financial)——Hess Financial's contributions to the Lakewood House represent a return on their investment. But Nelson testified that, after reviewing all the relevant bank records, there was only a $3,609.24 transfer from Hess Capital to Hess Financial.

The court finds based on the evidence developed at the hearing that very little, if any, of the money Hess Financial provided for the purchase and improvement of the Lakewood House represents a return on the Whitcrafts' investments in Hess Capital. Nevertheless, the court rejects the Receiver's first basis for holding Ronald in contempt for failing to deed the property to the Receiver. It cannot be said that Hess Financial owns the Lakewood House simply on the basis that it has invested a great deal of money purchasing and improving it. Of the $965,774.84 invested, $600,000 was not Hess Financial's money because Ronald borrowed this amount from Hess Financial. The Receiver and the SEC do not challenge the validity of Ronald's deed of trust and note with Hess Financial, even though Ronald has yet to make a payment under the note. Ronald still has an obligation to pay back the sum of $600,000, plus interest, to Hess Financial. A properly recorded deed shows that Ronald holds legal title to the Lakewood House. Unless the court sets aside the transfer to Ronald, the Lakewood House is not Hess Financial's property and thus not a receivership asset.

The Receiver's second basis for holding Ronald in contempt asks the court to do just that, i.e., to set aside the transfer of the Lakewood House as a fraudulent transfer under TUFTA. The Receiver posits that during the time that Hess Financial contributed at least $965,774.84 for the purchase and improvements to the Lakewood House, Hess Financial was insolvent, and that it did not receive reasonably equivalent value for these transfers of money. Although respondents challenge the merits of the Receiver's TUFTA claim, they argue as a threshold matter that a contempt hearing is not the proper proceeding in which to adjudicate a TUFTA claim.

"[T]he traditional rule is that summary proceedings are appropriate and proper to protect equity receivership assets." *United States v. Ariz. Fuels Corp.*, 739 F.2d 455, 458 (9th Cir. 1984) (affirming district court's use of summary proceedings to determine whether creditor of company under receivership could exercise setoff rights under contract between them); *see also SEC v. Am. Capital Invs., Inc.*, 98 F.3d 1133, 1146-47 (9th Cir. 1996) (affirming district court's reliance on summary proceedings to adjudicate investors' challenge to receiver's sale of receivership assets that involved court's determining ultimate property rights to property), *abrogated in part by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)); *SEC v. Wencke*, 783 F.2d 829, 836

(9th Cir. 1986) (rejecting "the investors' contention that district courts are flatly prohibited from adjudicating in summary post-judgment proceedings the claims of nonparties to property claimed by securities receivers."); *SEC v. Universal Fin.*, 730 F.2d 1034, 1037 (9th Cir. 1985) (per curiam) (affirming district court's use of summary proceedings to adjudicate investors' rights to promissory notes over which receiver also asserted ownership).

These cases demonstrate that a district court may employ summary rather than plenary proceedings to adjudicate the rights to property allegedly within the receivership estate.[9]  Such summary proceedings related to receiverships do not offend the parties' due process rights "so long as there is adequate notice and opportunity to be heard." *Am. Capital Invs.*, 98 F.3d at 1146; *see also Wencke*, 783 F.2d at 838 (rejecting investors' challenge to summary proceedings as violation of due process on ground that they could not show that they would have been better able to defend their interest in the property in plenary proceedings); *Universal Fin.*, 760 F.2d at 1037 (rejecting investors' due process challenge to summary proceedings, "because the district court afforded Investors

---

[9]Although *Arizona Fuels* drew a distinction between determining the right to possession and ultimate rights to title, and then stated that only the former disputes are properly brought in summary proceedings, *Ariz. Fuel*, 739 F.2d at 458-59, later Ninth Circuit panels have dismissed this distinction as dicta, affirming the district court's power to rely on summary proceedings to determine ultimate rights to title. *See Am. Capital Invs.*, 98 F.3d at 1147.

virtually all of the procedural protections which would have been available in plenary proceedings.").

But although respondents had sufficient time to prepare for the January 8 and 9, 2008 contempt hearing in this case, the Receiver first explicitly relied on claims under TUFTA in his second supplemental brief in support of the original contempt motion, which he did not file until December 31, 2007.  Respondents had a little more than one week to prepare a defense for these TUFTA claims.

C

Even if the court assumes *arguendo* that the Receiver gave respondents adequate notice of the TUFTA claims, the court is not persuaded that it can set aside a fraudulent transfer in the context of a contempt hearing.

Although the circuit decisions cited above lend support to the use of summary proceedings in a receivership to adjudicate a TUFTA claim, none supports the Receiver's contention that a summary *contempt hearing* is the proper setting to advance a claim under TUFTA.  A contempt hearing has a narrow focus: to determine whether a person has violated "a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."  *Castillo v. Cameron County*, 238 F.3d 339, 350 (5th Cir. 2001) (internal quotation marks omitted).  If characterizing property as part of

the receivership estate entails an analysis of the elements of a TUFTA claim, then it is at least questionable, if not doubtful, that respondents could have violated a "definite and specific" order in failing to surrender that property to the Receiver. It would take a second order declaring the property to be a receivership asset before the party could be held in contempt for failing to turn it over to the Receiver. Ronald holds legal title to the Lakewood House through a properly recorded deed. At this juncture, the only way the Lakewood House can be found to be a receivership asset is through the application of TUFTA. Thus even if the Lakewood House is in fact a receivership asset after application of TUFTA, Ronald cannot be held in contempt, because he did not fail to comply with a "definite and specific order." Moreover, adjudicating the Receiver's fraudulent transfer claims that were advanced in the contempt hearing is incompatible with the narrow focus of a contempt proceeding.

The few cases that have touched upon this topic support this conclusion. In *Resolution Trust Corp. v. Smith*, 53 F.3d 72 (5th Cir. 1995), the Fifth Circuit held that it was error for a district court to adjudicate a fraudulent transfer claim in post-judgment turnover proceedings, because turnover proceedings "cannot be used to litigate property rights of third parties." *Id.* at 79-80. The third-party's interest in the property "must be challenged in a further proceeding." *Id.* at 80. While *Resolution Trust* involved

a turnover, not a contempt, proceeding, a turnover order against a judgment debtor that directs the debtor to deliver to the court specific property owned by the debtor is very similar to the court's Receivership Order, which requires receivership assets to be delivered to the Receiver. Thus *Resolution Trust*'s reasoning, that determining the property rights of third parties would go beyond the proper scope of the proceeding at issue, also applies to contempt proceedings.

In *Berry v. Midtown Service Corp.*, 104 F.2d 107 (2d Cir. 1939), a judgment debtor company obtained a stay of execution of a judgment so as to have more time to decide whether to appeal. *Id.* at 108-09. During the stay, the judgment debtor transferred all its assets to affiliated companies. *Id.* The district court denied the judgment creditor's motion to hold the judgment debtor and his affiliates in contempt for fraudulently transferring the assets. *Id.* The circuit court affirmed, holding that "a party must have violated an express court order before he can be punished for contempt[.]" *Id.* at 110. The court concluded that "in cases such as the one at bar the judgment creditor's remedy for the wrong done him should be to upset the fraudulent transfers rather than to prosecute for a contempt of court." *Id.* at 111.

Accordingly, in this contempt proceeeding, the court will not reach the merits of the Receiver's TUFTA claims. Without the aid of TUFTA, the Receiver cannot prove that the Lakewood House is a

receivership asset.   Thus Ronald could not have violated the Receivership Order by refusing to convey title to the Receiver, and he cannot be held in contempt.

V

Finally, the Receiver contends that Bruteyn should be held in contempt of court for refusing to comply with the terms of the Receivership Order, which obligates him to deliver the BMW to the Receiver.  On and after the date the court issued the Receivership Order, Bruteyn has continued to drive the BMW, and he has not delivered it to the Receiver.  If the BMW is a receivership asset, Bruteyn has violated the Receivership Order, which requires that all defendants "promptly deliver to the Receiver all Receivership Assets in [their] possession or under [their] control[.]" Receivership Order § I(3).  Receivership assets include "properties, real and personal . . . of defendants . . . and Relief Defendants[.]" *Id.* at § I(1).  On January 2, 2007 Hess Financial purchased the BMW from American Eagle for $39,500.  There is no evidence in the hearing record regarding whether Bruteyn or Hess Financial holds title to the BMW.  But whether Bruteyn or Hess Financial owns legal title to the BMW is immaterial.  This is because personal property owned either by Bruteyn or Hess Financial is a receivership asset.  There is also evidence that, at the time Hess Financial purchased the BMW for $39,500, Bruteyn traded in a Porsche that he had been driving.  Even if Bruteyn did exchange the

Porsche and it was then worth about what he contends, the BMW is still owned by either Bruteyn or Hess Financial, and thus is a receivership asset. The court therefore holds Bruteyn in contempt for failing to deliver the BMW to the Receiver in accordance with the clear requirements of the Receivership Order.

VI

A

"Upon a finding of contempt, the district court has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (citing *Am. Airlines*, 228 F.3d at 585). "Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines*, 228 F.3d at 585 (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)). "The imposition or denial of sanctions of necessity involves a fact-intensive inquiry into the circumstances surrounding the activity that is the subject of sanctions." *Test Masters*, 428 F.3d at 582 (quoting *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988) (en banc)). When a contempt sanction is coercive, "the district court has broad discretion to design a remedy that will bring about compliance." *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673

F.2d 53, 57 (2d Cir. 1982) (citing *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979); *Powell v. Ward*, 643 F.2d 924, 933 (2d Cir. 1981) (per curiam)).  The court can require that the contemnors pay reasonable attorney's fees incurred by the moving party in obtaining a contempt finding.  *See Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977) ("Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt.  Discretion, including the discretion to award attorneys' fees, must be left to a court in the enforcement of its decrees." (citing *United Mine Workers*, 330 U.S. at 303-304)).  The court is also permitted to impose a conditional fine for the purpose of compelling the contemnor to comply with the court's order, provided the amount is reasonably designed to force compliance, without being punitive.  *In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980) (per curiam) (citing *United Mine Workers*, 330 U.S. at 303-04).  "A coercive, nonpunitive fine payable to the clerk of the court is an appropriate tool in civil contempt cases." *Id.* (citing cases and treatise).

"A fixed term of imprisonment, with the proviso that the contemnor will be released if he complies with the court order, is a proper penalty for civil contempt and the imposition of such penalty does not make the proceeding criminal."  *Id.*  A district court may order the civil contemnors imprisoned until they comply with the order or condition imposed by the court. *FDIC v. LeGrand*,

43 F.3d 163, 168 (5th Cir. 1995); *see also Hutto v. Finney*, 437 U.S. 678, 690 (1978) ("Civil contempt proceedings may yield a conditional jail term[.]").    "Unlike criminal contempt where imprisonment and a fine cannot be combined, a finding of civil contempt permits the coercive combination of both fine and imprisonment." *In re Dinnan*, 625 F.2d at 1150 (citation omitted).

B

The court has held Bruteyn, Offill, and Lois in civil contempt for the purchase of the Picasso with United Financial's funds. Because this transaction violated the Freeze Order on both sides of the transaction, the sanctions that the court will impose are intended to restore the status quo before the transaction.

The court orders the return of the sum of $431,161.00 to United Financial, which is now a relief defendant under the control of the Receiver.    To determine the proper amounts that each respondent is personally responsible for returning, the court must trace the disposition of these funds.

On July 5, 2007 Lois's bank account received a $431,161.00 wire transfer from United Financial's bank account.    On July 6, 2007 Lois applied $150,000 of the funds to pay down the mortgage on the Pennsylvania home in which she and Ronald reside.    After transferring part of the $431,161.00 through other Whitcraft accounts, Lois and Ronald wired another $150,000 to Martin LeNoir, Esquire ("LeNoir"), a criminal attorney whom Bruteyn had retained.

Counsel for certain respondents represented to the court that LeNoir no longer represents Bruteyn but has agreed to hold the $150,000 in his trust account pending a ruling by the court. On July 10, 2007 Ronald wired $70,000 to Offill from Ronald's personal line of credit.[10] Lois testified that the reason the $70,000 was paid to Offill using Ronald's line of credit is that a portion of the $431,161.00 was temporarily frozen when it came into her account on July 5, 2007. Thus the court traces Offill's reception of $70,000 from the Whitcrafts to the prohibited $431,161.00 transfer. Offill testified that $20,000 of the $70,000 has been returned to the Whitcrafts. The Receiver appears to agree with Offill, because he only requests that Offill be ordered to return $50,000 to the receivership estate.

Ronald testified that $7,000 of the Picasso sale proceeds were sent to Bruteyn. The Whitcrafts used the balance of the $74,161.00 for various personal expenses, e.g., attorney's fees and paying down their lines of credit.

C

The court orders Bruteyn to return the sum of $7,000 to the Receiver with 30 days of the date this memorandum opinion and order is filed. If he fails to do so, the court will order the United States Marshals Service to arrest Bruteyn and hold him in custody

---

[10]Although Ronald testified that he transferred only $59,000 to Offill, this contradicts the Whitcrafts' bank records and Lois' testimony, which show $70,000 was wired to Offill.

until he purges himself of the contempt by paying the Receiver the sum of $7,000.  Additionally, for each calendar day that Bruteyn is late in paying the sum of $7,000 to the Receiver, Bruteyn must pay to the clerk of court a fine in the sum of $500.

D

The court orders Offill to return the sum of $50,000 to the Receiver within 30 days of the date this memorandum opinion and order is filed.  If he fails to do so, the court will order the United States Marshals Service to arrest Offill and hold him in custody until he purges himself of the contempt by paying the Receiver the sum of $50,000.  Additionally, for each calendar day that Offill is late in paying the sum of $50,000 to the Receiver, Bruteyn must pay to the clerk of court a fine in the sum of $500.

E

The court orders Lois to return the sum of $224,161.00 to the Receiver within 30 days of the date this memorandum opinion and order is filed.  If she fails to do so, the court will order the United States Marshals Service to arrest Lois and hold her in custody until she purges herself of the contempt by paying the Receiver the sum of $224,161.00.  Additionally, for each calendar day that Lois is late in paying the sum of $224,161.00 to the Receiver, Lois must pay to the clerk of court a fine in the sum of $500.

Because the court is advised that LeNoir is willing to return to the Receiver the sum of $150,000 held in his trust account, the court directs that he do so within 30 days from the date this memorandum opinion and order is filed. The Receiver is responsible for advising LeNoir of this obligation. Because the court has based its ruling on the representation of respondents' counsel, without affording LeNoir the opportunity to contest the representation, LeNoir may advise the court in writing, no later than the deadline set, that he desires to oppose this requirement.

On December 10, 2007 Bruteyn filed a motion for release of the $150,000 held in LeNoir's trust account. Bruteyn relies on a provision of the Amended Receivership Order that exempts from the receivership estate money applied to Bruteyn's criminal defense.

The July 2, 2007 Receivership Order provides that "any attorney holding on behalf of any defendant or Relief Defendant, any retainer or other deposit of money or asset for legal services or any other purpose——except for representation in connection with a pending or potential criminal proceeding——shall promptly deliver such moneys or assets to the Receiver." Receivership Order § I(3).[11] In other words, this proviso exempts money that, as of the date of the court's order, was *already in an attorney's*

---

[11]This provision in the Receivership Order is materially identical to the provision in the Amended Receivership Order on which Bruteyn relies.

*possession* and the attorney was holding for representation in connection with a pending or potential criminal proceeding. LeNoir received the $150,000 at issue here as a direct result of Bruteyn's contemptuous conduct, i.e., *after* the court issued the July 2, 2007 Receivership Order. Therefore, Bruteyn is not entitled to use this money for his criminal defense, and the court denies Bruteyn's December 10, 2007 motion for release of funds

G

The court orders Bruteyn to surrender possession of the BMW, and the original title to the BMW, to the Receiver within 30 days from the date this memorandum opinion and order is filed. If he fails to do so, the court will order the United States Marshals Service to arrest Bruteyn and hold him in custody until he purges himself of the contempt by surrendering possession of the BMW and the original title to the BMW. Additionally, for each calendar day that Bruteyn is late in surrendering possession of the BMW and the original title to the BMW, Bruteyn must pay to the clerk of court a fine in the sum of $500.

The Receiver has agreed to provide Bruteyn a substitute vehicle for his use. Accordingly, after Bruteyn fully complies with this requirement, the Receiver is directed to provide Bruteyn a vehicle that is in good working condition.

The court also holds that the Receiver and the SEC are entitled to recover their reasonable and necessary attorney's fees and costs incurred in prosecuting the instant contempt motion.[12] Within 30 days of the date this memorandum opinion and order is filed, they must apply for such fees and costs by filing an application, supporting brief, and supporting evidence in the form of an appendix. Privileged material contained in the evidence may be redacted from the pleadings filed publicly and from the pleadings disclosed to respondents, but complete descriptions must be filed in a separate, unredacted version that is filed with the court under seal. The court will decide whether any parts of the redacted materials must be disclosed publicly or to respondents. Opposition briefs and supporting evidence in the form of appendixes must be filed within 20 days, and reply briefs must be filed within 15 days of the filing of the opposition response.

*     *     *

In sum, the court grants in part and denies in part the September 24, 2007 motion of the Receiver and the SEC. The court holds Bruteyn, Offill, and Lois in civil contempt and orders them to purge themselves of the contempt within 30 days with respect to

---

[12]In awarding this relief, the court does not suggest that the SEC and the Receiver are entitled to recover all the fees and expenses that they may request. That decision must await adjudication of the fee application.

their respective component parts of the $431,161.00 transfer, and also orders Bruteyn to purge himself with respect to the BMW. The court declines to hold Ronald in civil contempt and declines to order title or possession of the Lakewood House transferred to the Receiver. The question whether the Lakewood House is a receivership asset must be adjudicated separately, in a proper proceeding or civil action.

Bruteyn's Decemeber 10, 2007 motion for release of funds is denied.

**SO ORDERED.**

February 1, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE