IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § |
| Plaintiff, | § § Civil Action No. 3:07-CV-1188-D |
| VS. | § § |
| AMERIFIRST FUNDING, INC., et al., | § § § |
| Defendants. | § |

MEMORANDUM OPINION
AND ORDER

The court-appointed temporary ("Receiver") moves to make a first interim partial distribution of receivership funds to investors. Only defendant Dennis W. Bowden ("Bowden") opposes the Receiver's proposed distribution plan. For the reasons that follow, the court grants the Receiver's motion and directs that he distribute the receivership funds in accordance with his proposed Plan A.[1]

I

In January 2008 the Receiver moved to make a first interim partial distribution of estate funds to creditors. One day later, he filed his first amended motion, in which he proposes to

---

[1] Although for purposes of this decision the court need not set out the background facts of this receivership proceeding, they can be found in sources such as *SEC v. AmeriFirst Funding, Inc.*, 2008 WL 282275 (N.D. Tex. Feb. 1, 2008) (Fitzwater, C.J.) (civil contempt decision). Moreover, evidence developed during that hearing informs the court's exercise of its equitable power in today's decision.

distribute $25 million in receivership funds to investors of three receivership entities: AmeriFirst Acceptance Corp. ("AmeriFirst Acceptance"), AmeriFirst Funding, Inc. ("AmeriFirst Funding"), and Hess Financial Corp. ("Hess Financial"). The Receiver maintains that a partial distribution to investors at this time is appropriate because there are default judgments against most of the defendants and relief defendants in the underlying lawsuit. Through a proof of claims process, the Receiver has identified a total investment liability of $61.4 million for investments with these three receivership entities. At the time of the Receiver's first amended motion, all but four investors had provided proofs of claims.

The Receiver's proposed distribution plan treats the investors of AmeriFirst Acceptance, AmeriFirst Funding, and Hess Financial equally in that each investor's pro rata share of the $25 million is based on the investment's percentage of the total investment liability of all three entities. Because the amount owed to investors exceeds the assets of the receivership estate by over $17 million, the Receiver posits that no interest was earned on any investment; thus the Receiver's distribution plan characterizes monthly interest payments to investors as a return of principal. Many investors in these companies were given a choice by the companies of receiving monthly interest payments or compounding earned interest into their investments. The Receiver maintains

that the only way to put these two groups of investors on equal footing is to treat interest payments as a return of principal. Therefore, the Receiver's distribution plan deducts interest payments received from the investment amount to arrive at a net investment, upon which the investor's pro rata share is based as a percentage of the aggregate net investment for all three entities. This percentage is then applied to the $25 million to determine the investor's first interim partial distribution. The four investors who have yet to submit proofs of claims, and 33 investors whose files require more work, are not included in the Receiver's distribution plan, but the Receiver warrants that sufficient estate funds are retained to cover these claims.

A few weeks after filing his first amended motion, the Receiver filed a second amended motion to make a first interim distribution to investors. The Receiver's proposed distribution plan in the second amended motion—which the Receiver calls "Plan A"—is largely identical to the first amended motion, but it reflects more recent investor information.[2] The second amended motion, however, includes an alternative method of determining each investor's pro rata share of the $25 million distribution. The

---

[2]At the time of the first amended motion, there were 37 investors who were not included in the distribution plan (four of whom had not submitted proofs of claims, and 33 of whom had files that required more work). In the second amended motion, there are only 16 investors who are not included in the distribution plan (two of whom have not submitted proofs of claims and 14 of whom have files that require more work).

alternative method——which the Receiver calls "Plan B"——calculates each investor's pro rata share based on each investor's total investment, rather than net investment, and then deducts from the distribution amount any pre-receivership interest payments received on that investment. In essence, Plan B takes the $2,130,425.00 in pre-receivership interest payments from those who received them and distributes it among all investors. The Receiver recommends Plan A because, under Plan B, some of the investors who received pre-receivership interest payments would receive almost nothing in a first partial interim distribution of $25 million.

On the day the Receiver filed his second amended motion, Bowden filed objections to the Receiver's first amended motion to make first interim partial distribution. Bowden's principal argument is that the Receiver's proposed distribution plan pools together investors of AmeriFirst Acceptance, AmeriFirst Funding, and Hess Financial rather than distributing the assets of each distinct entity to the investors of that entity. Bowden maintains that a much higher percentage of investor money was left in the AmeriFirst companies than in Hess Financial. He therefore contends that pooling all investors together for a pro rata distribution of all receivership funds would be inequitable, because it would unjustly burden the AmeriFirst investors. Bowden argues that, as the head of the AmeriFirst companies, he had no control over Hess Financial, which was controlled by defendant Jeffrey E. Bruteyn

("Bruteyn") and was a completely separate entity. Bowden also posits that a distribution to investors should also distinguish between the AmeriFirst companies so that AmeriFirst Acceptance investors should receive a distribution only from AmeriFirst Acceptance assets, and the same for AmeriFirst Funding. Bowden avers that the AmeriFirst entities' funds were not commingled and there is no basis to treat the investors of each company alike.

Bowden also objects to the Receiver's practice of paying for his professional fees and expenses solely from the accounts of AmeriFirst Acceptance. He argues that much of the Receiver's efforts has been directed at marshaling the assets of Hess Financial, and the burden of the Receiver's fees and expenses should therefore be spread out among the receivership entities to fairly reflect the work the Receiver has devoted to each entity.

Last, Bowden opposes the Receiver's characterization of pre-receivership interest payments as a return of investment, contending that this will disproportionately harm investors who received interest payments for years.

In his reply brief, the Receiver defends the proposed distribution plan on the basis that the funds of the various receivership entities were commingled. The Receiver contends that there are countless instances in which AmeriFirst Acceptance and AmeriFirst Funding daily operating funds were commingled with each other and with investor money. As evidence of commingling of funds

between Hess Financial and the AmeriFirst companies, the Receiver points to the $6 million in commissions that Hess Financial received from the sale of securities of the AmeriFirst companies. The Receiver also highlights the incomplete accounting records of the receivership entities that, together with the instances of commingling, would make segregating a distribution among the various receivership entities difficult and expensive. Similarly, the Receiver argues that requiring him to account for his work for each receivership entity to apply the receivership expenses and fees to each individual entity would consume a significant amount of time and would further deplete the receivership estate. Moreover, the Receiver contends his actions have always aimed at the benefit of the entire receivership estate, so distinguishing among work expended for each individual receivership entity would be arbitrary.

II

A district court has wide latitude when it exercises its inherent equitable power in approving a distribution plan of receivership funds. *See SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (affirming distribution plan because it was "a logical way to divide the money") (internal quotation marks omitted) (approval of distribution plan reviewed for abuse of discretion); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (same). In approving a distribution plan of receivership

funds, "the district court, acting as a court of equity, [is] afforded the discretion to determine the most equitable remedy." *Forex*, 242 F.3d at 332. "Courts have favored *pro rata* distribution of assets where . . . the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002). But the absence of commingling between various receivership entities does not render a pooled, pro rata distribution inequitable. *See Forex*, 242 F.3d at 331-32.

In *Forex* the plaintiffs invested $100,000 with the Forex Asset Management, L.L.C. ("Forex") and later invested another $800,000, which Forex's manager assured them would be placed in a separate account to be traded more aggressively. *Id.* at 327. The plaintiffs' $800,000 was placed in a separate account owned by a separate company, FAM Preferred Trading Co. ("FAM Preferred"). *Id.* Shortly thereafter, the Securities and Exchange Commission ("SEC") filed an enforcement action against Forex and related individuals and entities; both Forex and FAM Preferred were placed in the same receivership. *Id.* at 327-28. Although Forex's assets could cover less than half of its indebtedness to investors, virtually all of the plaintiffs' $800,000 was in FAM preferred accounts, and their $800,000 investment was the only investor claim against FAM Preferred. *Id.* Over the plaintiffs' objection, the receiver

proposed, and the district court approved, a pro rata distribution of pooled funds from all receivership entities involved in the investor fraud as "the most equitable means of addressing all of the victim[s'] harms." *Id.* at 328 (internal quotation marks omitted). The Fifth Circuit affirmed. *Id.* at 332. The panel rejected the plaintiffs' argument that because their $800,000 investment was the only deposit into the FAM Preferred account, and because these funds were not commingled with Forex-owned accounts, the plaintiffs were entitled to be treated differently from the other victims of the fraud whose funds were held in Forex-owned accounts. *Id.* at 331-32. The plaintiffs also argued that they alone were entitled to a distribution of FAM Preferred funds because FAM Preferred was a separate legal entity. The Fifth Circuit declined to address this specific argument because the plaintiffs failed to raise it in the district court. *Id.* at 332.

Similar to *Forex*, without explicitly addressing the separate legal entity issue, the Fifth Circuit in *Durham* affirmed the district court's approval of a pro rata distribution that pooled together investors of different entities. *Durham*, 86 F.3d at 73. The defendants in the case perpetrated a scheme to defraud consumers through an advance fee loan financing business and created various front corporations to carry out their fraud. *Id.* at 71. Of the over $800,000 that the defendants took from 13 individuals, only $83,495.52 remained when the court froze the

defendants' assets. *Id.* Although the defendants had used multiple companies and accounts to implement their scheme, when they were finally stopped, the entire $83,495.52 was in one account. *Id.* All but $8,803.99 of the money in this account could be traced to seven claimants, but the district court chose to distribute the $83,495.52 pro rata among all who were victims of the fraud. *Id.* at 72. The panel held that the district court divided up the money in a logical way and therefore did not abuse its discretion. *Id.* at 73.

III

Neither *Forex* nor *Durham* explicitly addressed the issue whether the separateness of the entities that possess or possessed investor money precludes a pooled, pro rata distribution of all the entities' funds. But these cases suggest that such a pooled distribution is equitable when the separate legal entities were involved in a unified scheme to defraud. AmeriFirst Acceptance, AmeriFirst Funding, and Hess Financial were all involved in the sale of unregistered secured debt obligations ("SDOs") that formed the basis of the SEC's lawsuit. While much of the investor money went directly to the AmeriFirst companies, Hess Financial's sole source of income was commissions from the AmeriFirst companies for the sale of the SDOs. Even if there was no commingling of funds among these three entities, there is an equitable basis to pool their funds in a pro rata distribution to all investors.

Moreover, there was evidence adduced at the contempt hearing[3] that the AmeriFirst entities were in fact intertwined. Bowden was the president of AmeriFirst Funding and chief operating officer of AmeriFirst Acceptance. The bank records of the AmeriFirst entities were inadequate, and none of their bank accounts had ever been reconciled. In his reply brief, the Receiver points to numerous instances of commingling between the AmeriFirst companies, but he does not support these contentions with citations to the record evidence. Nevertheless, even without proof of specific instances of commingling of funds, the court finds that pooling the AmeriFirst companies assets is the most equitable approach given how closely related the entities were and their unity of governance in Bowden.

The pooling of Hess Financial funds with the AmeriFirst companies funds presents a closer question. Although Hess Financial participated in the sale of AmeriFirst SDOs, there was no evidence that Bowden had any legal control over Hess Financial or that Bruteyn, the head of Hess Financial, had any legal control over the AmeriFirst companies. Hess Financial's only source of income was commissions paid by the AmeriFirst entities for the sale of SDOs. But these commission payments cannot be characterized as commingling of funds between the AmeriFirst entities and Hess Financial. Nevertheless, *Forex* demonstrates that commingling of

---

[3]*See supra* at note 1 for the citation to the contempt hearing.

funds is not a prerequisite to pool investor money held by separate legal entities.  *See Forex*, 242 F.3d at 331-32.  Bruteyn and Bowden relied on numerous entities to carry out their investor fraud, and Hess Financial, by assisting in the sales of the SDOs, played an integral role in furthering the fraud.  Based on *Durham*, where the defendants similarly made use of numerous companies to further their scheme, there is an equitable basis to pool Hess Financial's funds together with the AmeriFirst companies' funds for a pro rata distribution to all investors.

Despite the legitimate concerns Bowden has raised concerning the pooling of Hess Financial funds together with those of the AmeriFirst companies in a distribution to investors, the court finds that this approach is the most equitable in light of Hess Financial's substantial involvement in defendants' investment fraud and the relatively slight impact on AmeriFirst investors of including Hess Financial in the pool of investors.  Excluding the two investors who have not submitted proofs of claims and the 14 investors whose files require additional work, the Receiver has accounted for $56,481,211.40 of net verified investments.  Of this amount, only a fraction—$2,188,000—is attributable to Hess Financial investors.  Although the court heard testimony in the contempt hearing that Hess Financial was insolvent at the time its assets were frozen on July 2, 2007, the court does not have evidence of how much money was in its accounts at that time.  But

even assuming under a worst-case scenario that Hess Financial has no assets, the impact of pooling the three entities' assets on the AmeriFirst investors is modest at best. For example, if Hess Financial investors are not pooled together with AmeriFirst investors, an investor who has a net investment of $1 million with an AmeriFirst entity would receive $460,462.73 under a pro rata distribution of $25 million. When Hess Financial investors are pooled, and assuming that Hess Financial has no assets, the same AmeriFirst investor would receive $442,625.07 on a $25 million distribution, just 3.87% less than without pooling. Moreover, these figures do not take into account 16 AmeriFirst investors. When these 16 AmeriFirst investors are later added into the equation, the burden on AmeriFirst investors of pooling Hess Financial investors is diluted even more. Based on the following considerations, the court concludes that the most equitable approach is to pool the assets of AmeriFirst Acceptance, AmeriFirst Funding, and Hess Financial in distributing pro rata the $25 million from the receivership estate.

IV

The court's conclusion also disposes of Bowden's objections to the Receiver's practice of deducting its professional fees and expenses solely from AmeriFirst Acceptance. Because pooling all three entities' assets for a pro rata distribution is the most equitable approach, the Receiver reasonably elected to deduct all

professional fees and expenses from AmeriFirst Acceptance. The Receiver did so on the basis that this would create a tax benefit that would be in the best interest of the entire receivership estate. Similarly, since the bottom line is increasing the value of the receivership estate as a whole, which directly redounds to the benefit of defrauded investors, there is no reason to require that the Receiver account for the time he has spent working for each individual receivership entity.

The court also rejects Bowden's objections to the Receiver's proposal to treat pre-receivership interest payments as a return of principal. *See SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 660 (6th Cir. 2001) (affirming distribution plan of receivership funds where interest payments to investors were treated the same as a return of principal). The court agrees with the Receiver that treating the pre-receivership interest payments as a return of investment is the best way of putting those investors who elected to receive interest payments on equal footing with those who elected to rollover their interest.

V

The last issue that the court must address is which of the Receiver's two proposed plans—Plan A or Plan B—yields a more equitable distribution.

The Receiver recommends Plan A as the better of the two, because under Plan B some investors who received pre-receivership

interest payments would not receive anything from a first interim partial distribution. The basic distinction between Plan A and Plan B is the difference between the net investment method (Plan A) and the rising tide method (Plan B) for the treatment of withdrawals of investment principal. *See Commodity Futures Trading Comm'n v. Equity Fin. Group, LLC*, 2005 WL 2143975, at \*24-\*25 (D.N.J. Sept. 2, 2005) (describing the two methods). A few courts have opted in favor of the rising tide method. *Id.* But these courts were dealing with pure withdrawals of principal rather than a re-characterization of interest payments as a return of principal to put investors on equal footing. Plan B, which relies on the rising tide method, is more beneficial to those investors who did not receive interest payments because the interest payments that some investors did receive are effectively taken away from them, put back into the pool of receivership assets, and distributed pro rata based on the investor's original investment amount. Under Plan A, those investors who received interest payments keep these interest payments as a return of principal without a pro rata reduction on them, although these investors' pro-rata share of the remaining receivership funds is reduced.

The court opts in favor of Plan A for three reasons. First, the decision to re-characterize interest payments received as a return of principal—which appears to be the best although imperfect way to put all investors on equal footing—arguably

prejudices those investors who did receive interest payments for some time. Adopting Plan B might further prejudice those same investors who received interest payments. Accordingly, together with the decision to re-characterize interest payments received as a return of principal, the election of Plan A, which may slightly favor those who did receive interest payments, seems to balance the positions of those investors who received interest payments and those who did not.

Second, the amount of pre-receivership interest payments at issue here—$2,130,425.00—is relatively small in comparison to the total assets available for distribution: upwards of $30 million. Thus the difference between Plan A and Plan B on the whole is not great, but as the Receiver points out, the difference does have a significant impact on a few individuals who would not receive any distribution under a Plan B first interim partial distribution.

Third, the court defers to the recommendation of the Receiver in choosing between two distribution plans that, in many respects, have differences that are incommensurable.

VI

Accordingly, the court grants the Receiver's February 6, 2008 second amended motion to make first interim partial distribution in accordance with Plan A.[4] To the extent they are not subsumed in

---

[4]The details of how the $25 million distribution of estate funds will affect each individual investor under Plan A is contained in Exhibit A of the Receiver's second amended motion.

the Receiver's February 6, 2008 second amended motion, the Receiver's January 23, 2008 motion to make first interim partial distribution of estate funds to creditors, and his January 24, 2008 first amended motion to make first interim partial distribution of estate funds to creditors, are denied without prejudice as moot.

The Receiver may begin making the distributions no fewer than fourteen calendar days after this memorandum opinion and order is filed. Unless Bowden or another objecting party files an appeal and obtains a stay from this court or from the court of appeals, the Receiver may then begin making such distributions.

**SO ORDERED.**

March 13, 2008.

                              SIDNEY A. FITZWATER
                              CHIEF JUDGE