IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE §
COMMISSION, §
§
                    Plaintiff, §
§ Civil Action No. 3:07-CV-1188-D
VS. §
§
AMERIFIRST FUNDING, INC., §
et al., §
§
                    Defendants. §

MEMORANDUM OPINION
AND ORDER

Pursuant to the interlocutory default judgment against defendant Jeffrey C. Bruteyn ("Bruteyn") and the default disgorgement order against relief defendant Hess Financial Corp. ("Hess Financial"), plaintiff Securities and Exchange Commission ("SEC") applies for a final judgment quantifying the disgorgement award against both Bruteyn and Hess Financial and for third-tier civil penalties against Bruteyn under § 20(d) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(d), and § 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d).

I

On July 2, 2007 the SEC sued Bruteyn, Dennis W. Bowden ("Bowden"), AmeriFirst Funding, Inc. ("AmeriFirst Funding"), and AmeriFirst Acceptance Corp. ("AmeriFirst Acceptance"), alleging that they were operating an investment fraud, in violation of §§ 5(a), (c), and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a),

77e(c), and 77q(a), and § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).[1] The SEC joined American Eagle Acceptance Corp. and Hess Financial as relief defendants. The SEC later amended its complaint to include five additional relief defendants.

On August 28, 2007 the Clerk of Court entered defaults against both Bruteyn and Hess Financial. The next day, the court entered an interlocutory default judgment against Bruteyn that (1) directs him to disgorge an amount equal to the funds he obtained illegally as a result of the violations alleged in the SEC's first amended complaint, plus prejudgment interest on that amount; (2) subjects him to third-tier penalties under § 20(d) of the Securities Act and § 21(d) of the Exchange Act; and (3) enjoins him from violating the provisions of the securities laws that formed the basis of the SEC's suit. The interlocutory default judgment directs the SEC to apply for an order quantifying Bruteyn's disgorgement liability and the amount of a civil penalty.

The same day the court entered the interlocutory default judgment against Bruteyn, it entered an equivalent order against Hess Financial, providing that Hess Financial disgorge an amount equal to the funds it obtained illegally as a result of the

---

[1]Although for purposes of this decision the court need not set out the background facts of this receivership proceeding, they can be found in the court's decision on a civil contempt motion. *See SEC v. AmeriFirst Funding, Inc.*, 2008 WL 282275, at *1-*2 (N.D. Tex. Feb. 1) (Fitzwater, C.J.), *appeals docketed*, No. 08-10174 (5th Cir. Feb. 26, 2008), and No. 08-10257 (5th Cir. Mar. 20, 2008).

violations alleged in the SEC's first amended complaint, plus prejudgment interest on that amount. The order similarly directs the SEC to submit an application to quantify the disgorgement award.

Based on the interlocutory default judgment against Bruteyn and the default disgorgement order against Hess Financial, the SEC now applies for a final judgment quantifying the disgorgement amount for both Bruteyn and Hess Financial as well as the civil penalty against Bruteyn. The SEC also seeks prejudgment interest. Neither Bruteyn nor Hess Financial has filed an opposition response to the SEC's application.

II

The court first determines the amounts that Bruteyn and Hess Financial must disgorge.

A

"'Disgorgement wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs.'" *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007) (quoting *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993)). "The district court has broad discretion in fashioning the equitable remedy of a disgorgement order." *SEC v. Huffman*, 996 F.2d at 803. "Because disgorgement is meant to be remedial and not punitive, it is limited to property causally related to the wrongdoing at

- 3 -

issue." *Allstate Ins.*, 501 F.3d at 413 (internal quotation marks omitted). "Accordingly, the party seeking disgorgement must distinguish between that which has been legally and illegally obtained." *Id.* "The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment." *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978).

"In actions brought by the SEC involving a securities violation, 'disgorgement need only be a reasonable approximation of profits causally connected to the violation.'" *Allstate Ins.*, 501 F.3d at 413 (quoting *SEC v. First City Fin. Corp.*, 890 F.3d 1215, 1231 (D.C. Cir. 1989)). Once the SEC meets its burden of showing that "its disgorgement figure reasonably approximates the amount of unjust enrichment," the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *SEC v. First City Fin.*, 890 F.2d at 1232.

"'Where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they may be held jointly and severally liable for the disgorgement of illegally obtained proceeds.'" *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1117 (9th Cir. 2006) (brackets omitted) (quoting *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998)); *see also SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); *SEC v. First Jersey Sec., Inc.*,

101 F.3d 1450, 1475-76 (2d Cir. 1996).

"'The defendant, by his default' admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established. A default judgment is unassailable on the merits[.]'" *Jackson v. FIE Corp.*, 302 F.3d 515, 524 (5th Cir. 2002) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

## B

### 1

Since at least January 2006, Bruteyn, together with Bowden, sold secured debt obligations ("SDOs") through the AmeriFirst entities (i.e., AmeriFirst Funding and AmeriFirst Acceptance, collectively) to hundreds of investors, many of whom were senior citizens.[2] Bruteyn and Bowden controlled all aspects of the AmeriFirst entities' operations. Bruteyn was the managing director of both AmeriFirst entities. Defendants' sale of these SDOs violated the securities laws in two fundamental ways. First, defendants never filed a registration statement for the SDOs under § 5 of the Securities Act. Thus the sale of each security contravened §§ 5(a) and 5(c) of the Securities Act, because defendants sold these SDOs to the public through a general

---

[2]When recounting the facts, the court relies on the well-pleaded facts alleged in the SEC's first amended complaint.

solicitation.   Second, defendants knowingly, or with severe
recklessness regarding the truth, made misrepresentations and
omitted material facts in connection with the offer or sale of the
SDOs, in violation of § 17(a) of the Securities Act and § 10(b) of
the Exchange Act.[3]   Based on Bruteyn's close involvement with
Bowden, and Bruteyn's control over the AmeriFirst entities, the
court agrees with the SEC that Bruteyn should be held jointly and
severally liable for all of the illegally obtained proceeds
generated from the sale of the SDOs, regardless whether Bruteyn was
specifically involved with each specific offer and sale.

                                 2

     In the context of an offering of securities in violation of
the securities laws, the proper starting point for a disgorgement
award is the total proceeds received from the sale of the
securities.   *See, e.g.*, *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d
1082, 1104 (2d Cir. 1972).   The SEC's application contains evidence
that defendants collected a gross amount of $58,597,965.26 from the
illegal sale of SDOs.[4]   The SEC contends that Bruteyn should
receive a credit against the sum of $58,597,965.26 for the amount

---

[3]Defendants' false or misleading statements include: the SDOs
were a safe, low-risk investment; the SDOs were guaranteed by a
commercial bank; investors were insulated from risk by several
layers of insurance coverage; and the investment was protected by
collateral.    Defendants    further    defrauded    investors    by
misappropriating investor money.

[4]This gross amount of investor receipts does not include
unverified investor claims.

returned to investors during defendant's securities fraud scheme. The SEC's application establishes that, before the SEC filed this lawsuit, and during the course of the scheme, defendants returned $2,214,925.83. Thus the SEC maintains that Bruteyn's proper disgorgement liability is $56,383,039.43, the total amount generated from the sale of the SDOs, less the money returned to investors during the scheme. The court agrees that Bruteyn is entitled to a credit for the $2,214,925.83 returned to investors during the scheme, but it also concludes, contrary to the SEC's proposal, that Bruteyn is entitled to a credit for investor funds returned to investors through the court-appointed temporary receiver ("Receiver"), even though these funds will be returned after defendants' scheme concluded.

None of the cases that the SEC cites supports the proposition that a credit against a disgorgement award for money returned to investors is limited to money returned during the scheme. *Manor Nursing* and *SEC v. R.J. Allen & Associates, Inc.*, 386 F. Supp. 866 (S.D. Fla. 1974), held that the proper disgorgement amount is the total proceeds received in connection with the illegal offering of securities. Neither case indicates whether any money was returned to investors before or after the defendants' scheme. *See Manor Nursing*, 458 F.2d at 1104; *SEC v. R.J. Allen & Assocs.*, 386 F. Supp. at 881. In *SEC v. Merril Scott & Associates, Ltd.*, 505 F.Supp.2d 1193 (D. Utah 2007), the court set the disgorgement

amount at $13,140,000——the amount the defendant "caused investors to lose"——but did not state how much the defendant received as a result of the illegal offering or whether any money was returned to investors before or after the SEC intervened. *See id.* at 1216. In *SEC v. The Better Life Club of Am., Inc.*, 995 F. Supp. 167 (D.D.C. 1998), *aff'd*, 203 F.3d 54 (D.C. Cir. 1999) (table decision), the evidence established that "$25,805,577 of investor principals remained unreturned at the time of the temporary restraining order." *Id.* at 179. The court set $25,805,577 as the disgorgement liability of the defendants, but there was no indication that any money was returned to investors after the temporary restraining order took effect. *See id.* Similarly, in *SEC v. JT Wallenbrock & Associates* the court set the disgorgement order at $139.4 million, which represented the total money generated from the defendants' Ponzi scheme, less money returned to investors during the scheme. *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d at 1112-13. But when the SEC filed suit, only $3 million of the investors' money remained unspent, and the court's opinion did not suggest this money was going to investors. *See id.* It is likely that a significant portion of this $3 million supported the court-appointed receiver. *Id.* All the cases that the SEC cites are consistent with granting Bruteyn a credit against the sum of $56,383,039.43 for investor money returned after defendants' scheme concluded.

Two of the cases the SEC cites actually support the premise

that Bruteyn is entitled to a credit for post-lawsuit returns of investor money. In the context of an illegal offering of securities, the court in *SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1 (D.D.C. 1998), set disgorgement at "$264,245.10, which represents the difference between the funds actually collected by [the defendant] and the principal that has either been re-paid to investors or collected into the registry of the Court." *Id.* at 15. Thus the court reduced the defendant's disgorgement liability for post-lawsuit payments of investor money into the registry of the court. Similarly, in *SEC v. Chemical Trust*, 2000 WL 33231600 (S.D. Fla. Dec. 19, 2000), after setting the disgorgement amount, the court concluded, "it would be inequitable to require [the relief defendant] to disgorge funds . . . not otherwise placed in the hands of third parties beyond the reach of the investors." *Id.* at *12. Thus investor money within reach of the investors (i.e., money the investors will eventually obtain) should reduce a defendant's disgorgement liability. The court's later conclusion made this point even clearer:

> [F]unds that the FBI seized from [the relief defendant], $26,940.28 pursuant to a seizure warrant issued in a parallel criminal investigation may inure at a later time to the benefit of the defrauded investors herein. To the extent those funds do inure to the benefit of investors, they should be credited against [the relief defendant's] accounting.

*Id.* Thus the court granted the defendant a credit on its disgorgement liability for investor funds returned after the

defendants' scheme was over.

In two cases that the SEC does not cite, the court reduced the defendants' disgorgement liability to the extent the court-appointed receiver returned money to the defrauded investors. *SEC v. Kikland*, 521 F.Supp.2d 1281, 1307 (M.D. Fla. 2007) ("Defendant Kirkland shall be DISGORGED, with prejudgment interest, of all ill-gotten profits or proceeds received from the investing public as a result of the acts or courses of conduct described in the Complaint, *less any distributions made by the Receiver to investors*[.]" (emphasis added)); *SEC v. Friendly Power Co.*, 49 F.Supp.2d 1363, 1374 (S.D. Fla. 1999) ("[The defendants] are hereby, DISGORGED . . . of all ill-gotten profits or proceeds . . . for the total value of funds received from the investing public ($2,400,000.00), *less any distributions made by the Receiver to investors*." (emphasis added)).

In addition to these cases that support reducing Bruteyn's disgorgement liability for returns of investor money even after his securities fraud scheme ended, the basic principles of disgorgement require the same conclusion. Disgorgement aims at preventing the defendant from profiting from his wrongdoing. In this case, defendants' illegal conduct generated over $58 million from investors. This entire sum potentially constitutes Bruteyn's ill-gotten gains from the illegal scheme, even if he diverted all of this money to other people. *See SEC v. Benson*, 657 F. Supp. 1122,

1134 (S.D.N.Y. 1987) ("The manner in which [the defendant] chose to spend his misappropriations is irrelevant as to his objection to disgorge. Whether he chose to use this money to enhance his social standing through charitable contributions, to travel around the world, or to keep his co-conspirators happy is his own business."). But when part of this amount is returned to investors, whether before or after his securities scheme ended, that portion of the $58 million cannot be characterized as the defendant's gain or profit. "The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment." *SEC v. Blatt*, 583 F.2d at 1335. Therefore, the court holds that Bruteyn must disgorge the sum of $56,383,039.43, less any distribution made to investors by the Receiver.

3

This disgorgement order does not take into account whether, and how much, Bruteyn and Bowden applied investor money to cover the business expenses of the AmeriFirst entities. While some courts have concluded that disgorgement liability is never reduced for business expenses, see *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1087 (D.N.J. 1996) ("[T]he overwhelming weight of authority holds that securities law violators may not offset their disgorgement liability with business expenses."), *aff'd*, 124 F.3d 449 (3d Cir. 1997); *SEC v. Great Lakes Equities Co.*, 775 F. Supp.

- 11 -

211, 214 (E.D. Mich. 1991) ("[D]eductions for overhead, commissions and other expenses are not warranted."), *aff'd*, 12 F.3d 214 (6th Cir. 1993), others have distinguished between legitimate and illegitimate business expenses, *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d at 1114-15 (suggesting that business expenses that did not further fraudulent scheme could reduce disgorgement award). But the court need not resolve this question. The SEC has met its burden of showing that the sum of $56,383,039.43, offset by distributions to investors, is a reasonable approximation of profits causally connected to Bruteyn's securities violations. Thus the burden shifts to Bruteyn to show that this amount is not a reasonable approximation. *See SEC v. First City Fin.*, 890 F.2d at 1232. Bruteyn has not demonstrated that defendants applied any of the $58 million received from investors to legitimate business expenses. Consequently, the court's disgorgement order properly disregards business expenses.

4

The SEC requests that the final judgment against Bruteyn include prejudgment interest on his ill-gotten gains. The interlocutory default judgment against Bruteyn provides that Bruteyn must pay prejudgment interest on his unjust profits. "Courts have recognized that an assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws."

*SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) (quotation marks omitted).  The SEC's proposed interest payment of $1,894,470.11 is based on the Internal Revenue Service's ("IRS's") interest rate for tax underpayments.  "[T]he IRS underpayment rate . . . reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud."  *SEC v. First Jersey*, 101 F.3d at 1476 (approving application of IRS underpayment rate for calculating prejudgment interest on amounts disgorged as a result of securities violations).  Instead of applying the IRS underpayment rate to each individual investment, the SEC calculated interest by applying the interest rate to the $56,383,039.43 from February 1, 2007 until July 1, 2007, the day before the SEC filed suit.  The court finds that this is a reasonable method of calculating interest, despite its earlier conclusion that Bruteyn is entitled to a reduction from his disgorgement liability for receivership distributions to investors.  That the Receiver may return some (or even most) of the $56,383,039.43, and thus reduce Bruteyn's disgorgement liability, does not alter the fact that the entire $56,383,039.43 (or close to that amount)[5] was at defendants' disposal before the receivership went into effect.  The court therefore orders that Bruteyn pay

_____

[5]Although defendants had not received all the investor money as of February 1, 2007, the SEC's interest calculations do not include interest on any investor money that defendants received before February 2007.

- 13 -

prejudgment interest in the amount of $1,894,470.11.

C

1

The SEC also seeks to quantify a disgorgement award against relief defendant Hess Financial, a company that Bruteyn controlled. "[T]he SEC may seek disgorgement from 'nominal' or 'relief' defendants who are not themselves accused of wrongdoing in a securities enforcement action where those persons or entities (1) have received ill-gotten funds, and (2) do not have a legitimate claim to those funds." *SEC v. DCI Telecomms., Inc.*, 122 F.Supp.2d 495, 502 (S.D.N.Y. 2000) (citing *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)); *see also SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998). Throughout defendants' campaign to sell SDOs through the AmeriFirst entities, Hess Financial received from the AmeriFirst entities millions of dollars of investor money as "consulting fees." Hess Financial directed much of this money to pay referral fees to the AmeriFirst entities' sales agents, who where selling the illegal SDOs. Because (1) the AmeriFirst entities paid Hess Financial with ill-gotten funds from investors who purchased the illegal SDOs and (2) Hess Financial does not have a legitimate claim to these funds, Hess Financial should disgorge the "consulting fees" it received from the AmeriFirst entities. Although Hess Financial might have had a legitimate claim to "consulting fees" had it been unaware that its consulting services

- 14 -

were furthering securities fraud, Hess Financial cannot invoke a good faith defense because its head, Bruteyn, was a principal actor in the securities fraud scheme.

The evidence on which the SEC relies to support its application shows that Hess Financial received, directly or indirectly, a gross amount of $9,461,716.49 in investor funds. Of this amount, Hess Financial returned to investors or the AmeriFirst entities $989,034.89. Thus the SEC contends that Hess Financial's disgorgement liability should be $8,472,681.60.

The court finds that $8,472,681.60 is a reasonable approximation of Hess Financial's profits causally connected to the securities violations alleged in the SEC's first amended complaint. As with Bruteyn's disgorgement order, the court need not determine whether this award ought to be reduced for legitimate business expenses, because Hess Financial has failed to carry its burden of showing that it applied some of the $8,472,681.60 to legitimate business expenses. *See supra* § II(B)(3). Thus the court orders Hess Financial to disgorge $8,472,681.60.

2

The SEC also seeks to recover prejudgment interest on Hess Financial's disgorgement liability. As with Bruteyn, the SEC's interest calculation with respect to Hess Financial applies the IRS underpayment rate to the entire disgorgement amount ($8,472,681.60) for a six-month period from February 1, 2007 until July 1, 2007.

The court agrees with the SEC that $284,683.06 is the proper measure of prejudgment interest, and it adds this amount to Hess Financial's disgorgement liability.

3

The SEC argues, based on principles of joint and several liability, that Bruteyn should be held liable for Hess Financial's disgorgement award of $8,472,681.60, plus prejudgment interest, in addition to his individual disgorgement liability of $56,383,039.43, plus prejudgment interest, less Receiver distributions of investor money. The court denies this requested relief.

Based on the SEC's application, Brtueyn's disgorgement liability of $56,383,039.43 represents all of the investor money that defendants generated from the illegal conduct alleged in the first amended complaint. Thus Hess Financial's disgorgement liability ($8,472,681.60) represents the portion of the $56,383,039.43 that defendants directed to Hess Financial. Because the $8,472,681.60 of illegally obtained investor money is simply a part of the aggregate of $56,383,039.43 in unreturned investor money, it is already included in the court's disgorgement order as to Bruteyn. Holding Bruteyn liable for Hess Financial's disgorgement award in addition to his individual award essentially counts a portion of his unjust profits twice. Tacking on the additional sum of $8,472,683.60 to Bruteyn's disgorgement

liability——even under the mechanism of joint and several liability——would constitute a penalty, because the disgorgement award would surpass the amount by which Bruteyn and the other defendants profited from their securities violations.

Rather than hold Bruteyn jointly and severally liable for Hess Financial's disgorgement liability in addition to his own, the court holds that Hess Financial is jointly and severally liable for the sum of $8,472,683.60, plus prejudgment interest, of Bruteyn's disgorgement liability. A payment by Hess Financial toward its disgorgement liability therefore reduces Bruteyn's disgorgement liability by the same amount. This holding follows from the court's conclusion that the sum of $8,472,683 of investor money that went to Hess Financial is nothing more than a portion of the total sum of $56,383,039.60 that investors paid.

III

The SEC also requests that the final judgment against Bruteyn include third-tier civil penalties under § 20(d) of the Securities Act and § 21(d) of the Exchange Act.

A

"Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." *SEC v. Opulentica, LLC*, 479 F.Supp.2d 319, 331 (S.D.N.Y. 2007). "Without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains." *SEC v. Koenig*, 532

F.Supp.2d 987, 995 (N.D. Ill. 2007). Section 20(d) of the Securities Act permits the court to impose a penalty of up to $120,000 on a defendant for a securities violation that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C)(i), (ii); 17 C.F.R. § 201.1003 (2007) (raising the maximum penalty amount to $120,000 for individuals). On the same basis, § 21 of the Exchange Act permits the court to impose a penalty of up to $120,000 on a defendant for each violation of the securities laws. 15 U.S.C. § 78u(d)(3)(B)(iii)(aa), (bb); 17 C.F.R. § 201.1003 (2007) (raising the maximum penalty amount to $120,000 for individuals).

Bruteyn is subject to a third-tier civil penalty under § 20(d) of the Securities Act because he violated § 17(a)(1)-(3) of the Securities Act, and each of the these violations involved fraud or deceit. Moreover, these violations directly or indirectly caused substantial losses to other people. Likewise, Bruteyn is subject to a third-tier civil penalty under § 21(d) of the Exchange Act because his violations of § 10(b) of the Exchange Act involved fraud or deceit, and this conduct directly or indirectly caused substantial losses to other people.

Neither § 20(d) of the Securities Act nor § 21(d) of the Exchange Act provides any guidance as to the proper amount of the

civil penalty. A number of courts, however, have relied on the same principles in making this decision.

> In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Opulentica*, 479 F.Supp.2d at 331 (citing *SEC v. Coates*, 137 F.Supp.2d 413, 428-29 (S.D.N.Y. 2001) (listing factors)); *SEC v. Haligiannis*, 470 F.Supp.2d 373, 386 (S.D.N.Y 2007) (relying on these five factors); *SEC v. Lybrand*, 281 F.Supp.2d 726, 730 (S.D.N.Y. 2003) (same), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005). Some courts have interpreted the fifth factor simply as the defendant's ability to pay. *See SEC v. Druffner*, 517 F.Supp.2d 502, 513 (D. Mass. 2007). Other courts have considered such additional factors as the cooperation of the defendant with law enforcement authorities and the adequacy of other criminal or civil sanctions to punish the defendant. *See SEC v. Lewis*, 492 F.Supp.2d 1173, 1174 (D.S.D. 2007); *SEC v. Church Extension of the Church of God, Inc.*, 429 F.Supp.2d 1045, 1050-51 (S.D. Ind. 2005). "While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a discretionary nature and each case has its own particular facts and

circumstances which determine the appropriate penalty to be imposed." *SEC v. Opulentica*, 479 F.Supp.2d at 331 (internal quotation marks omitted).

Some courts have taken a per violation approach to computing the total civil penalty, *see SEC v. Koenig*, 532 F.Supp.2d at 995, while others have based the total civil penalty on the number of investors, in the context of an illegal offering of securities, *SEC v. Kenton Capital*, 69 F.Supp.2d at 17 n.15.

B

Most of the factors counsel in favor of imposing a high civil penalty. Bruteyn's securities violations were egregious, not only with respect to the sheer number of misrepresentations in connection with the sale of the SDOs, but also in their nature. Defendants held out their securities as collateralized; they were not. They marketed the SDOs as "guaranteed" by a commercial bank; they were not. The sales literature for the SDOs represented the investment as a safe alternative to certificates of deposit; defendants placed the money instead in high risk ventures.

The degree of Bruteyn's scienter is also high. Bruteyn was very familiar with the securities markets. He had been trading securities as a professional since at least 1994. He is also quite sophisticated, priding himself on having graduated from the Wharton School of Business. Bruteyn must have known that many of defendants' representations to investors were seriously misleading

or completely false. His conduct has caused substantial losses——ranging from $10 to $20 million[6]——to those who purchased the SDOs. Moreover, these losses only account for unreturned principal, and do not factor in the accrued interest investors were expecting and could have obtained through other, safer investments. Bruteyn's involvement in this fraudulent scheme was not an isolated incident. Bruteyn has been repeatedly penalized for securities-related conduct.

The fifth factor is the only one that cuts the other way. Although the court has no evidence of Brutyen's financial condition, the SEC admits in its brief that Bruteyn will unlikely be able to pay the entire disgorgement amount. Nevertheless, the ability of Bruteyn to pay a civil penalty, even if relevant, is merely one factor in the court's analysis.

The two other factors that some courts have considered——cooperation with law enforcement and the adequacy of other penalties to punish the defendant——do not assist Bruteyn. As for cooperation, Bruteyn orchestrated a scheme to circumvent the court's July 2, 2007 Freeze Order and obtain $431,161 through the sale of a counterfeit Picasso painting for which the court held Bruteyn in contempt of court. *See SEC v. AmeriFirst Funding, Inc.*, 2008 WL 282275, at *2, *4-*11 (N.D. Tex. Feb. 1) (Fitzwater, C.J.),

---

[6]This estimate is based on previous representations of the Receiver.

*appeals docketed*, No. 08-10174 (5th Cir. Feb. 26, 2008, and No. 08-
10257 (5th Cir. Mar. 20, 2008); *Lybrand*, 281 F.Supp.2d at 731-32
(relying on defendant's violation of freeze order as factor in
setting civil penalty).   Moreover, Bruteyn also violated the
court's July 2, 2007 Receivership Order and August 2, 2007 Amended
Receivership Order by refusing to turn over to the Receiver his BMW
vehicle, which also resulted in the determination that Bruteyn be
held in civil contempt.   *AmeriFirst Funding*, 2008 WL 282275, at
*16.

     As for the adequacy of other penalties, there is a strong
possibility that Bruteyn will be charged criminally.   *See SEC v.
AmeriFirst Funding Inc.*, 2008 WL 866065, at *3 (N.D. Tex. Mar. 17,
2008) (Fitzwater, C.J.) (finding it likely that criminal charges
against Bruteyn for the same conduct alleged by the SEC were
forthcoming).   But Bruteyn has yet to be criminally punished, and
it is not certain that he will be.   Because a civil penalty under
the securities laws might be the only sanction that Bruteyn faces
for his conduct, this factor is at least neutral.

     Considering all of the factors, the court concludes that it
should impose a $2,000 penalty for each investment that defendants
received, because each such payment constitutes a separate
violation of the securities laws.   The Receiver has verified that
defendants received 589 total investments during their scheme to
defraud.   The court therefore assesses a civil penalty against

Bruteyn in the sum of $1,178,000.

IV

The SEC does not specifically request that the court permanently enjoin Bruteyn from violating the securities laws on which its suit is based. But the SEC's proposed final judgment contains such a section. The SEC appears to construe the interlocutory default judgment against Bruteyn as a permanent injunction of the securities laws that Bruteyn violated. Although the court does not construe the interlocutory default judgment as containing a permanent injunction——the default judgment is interlocutory——the court interprets the SEC's proposed final judgment as an implied request to enjoin Bruteyn permanently from violating §§ 5(a), 5(b), and 17(a) of the Securities Act, § 10(b) of the Exchange Act, and SEC Rule 10b-5. Moreover, the first amended complaint contains a general prayer for relief. *See* Am. Compl. ¶ IX (seeking "such further relief as the Court may deem just and proper").

Section 20(b) of the Securities Act and § 20(d) of the Exchange Act "authorize the [SEC] to seek and direct the courts to enter permanent restraining orders upon a 'proper showing' that the defendant 'is engaged or is about to engage' in violations of the securities laws." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. Unit A July 1981). Courts normally analyze a number of factors to determine whether past violations of the securities laws

constitutes a "'reasonable likelihood' of future transgressions," *id.*, but that is unnecessary in this case, because the first amended complaint affirmatively establishes the "proper showing" that Bruteyn will violate the securities provisions at issue unless he is permanently enjoined. This part of the amended complaint explicitly avers that defendants will continue to violate these provisions unless enjoined. The court therefore permanently enjoins Bruteyn from violating §§ 5(a), 5(c), and 17(a) of the Securities Act and § 10(b) of the Exchange Act and SEC Rule 10b-5.

\*     \*     \*

For the reasons stated, the court grants the SEC's February 2, 2008 motion for entry of a final judgment. By Fed. R. Civ. P. 54(b) final judgment filed today, the court grants relief against Bruteyn and Hess Financial consistent with that set forth in this memorandum opinion and order.

**SO ORDERED.**

May 5, 2008.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE